# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

---

|
|
ALAINA M. ZANKE-JODWAY and       |
TIMOTHY M. JODWAY,       |      Case No. 1:08-cv-930
|
      Plaintiffs,       |
| HONORABLE PAUL L. MALONEY
        v.       |
|
CITY OF BOYNE CITY, a municipal corporation,    |
|
ELEANOR STACKUS, individual    [Mayor],    |
RONALD GRUNCH, an individual   [Commissioner],   |
DAN ADKISON, an individual     [Commissioner],   |
JERRY DOUGLAS, an individual   [Commissioner],   |
DENNIS JASON, an individual    [Public Works Dep't] |
MICHAEL CAIN, an individual    [City Manager],   |
DAN MEADS, an individual     [Water Dep't Dir.],   |
|
CAPITAL CONSULTANTS, INC., a Michigan Corp.,   |
LAWRENCE FOX, an individual,    |
JAMES E. HIRSCHENBERGER, an individual,[1]   |

---

[1]

     Today's decision eliminates one of the plaintiffs' seven claims against the Capital defendants. The court determined that:

     (1)      the statutes invoked in counts 7, 8 and 9 permit private-citizen suits, but only for declaratory and equitable relief, not damages, fines, attorneys fees and costs, etc.;

     (2)      plaintiffs have standing to bring the environmental statutory claims in counts 7-9; and

     (3)      even if the plaintiffs seem to have made out a *prima facie* case on the environmental statutory claims in counts 7-9 as to the Capital defendants which those defendants thus far have not yet persuasively rebutted, summary judgment would be premature before the completion of discovery;

     (4)      The Michigan Supreme Court's *Fultz* tort/contract doctrine forecloses count count 14 (negligence) as to the Capital defendants, but they have not presented authority for applying the *Fultz* doctrine to foreclose counts 7-9

BEN SACKRIDER, an individual,                          |
PHILLIP VAN DERMUS , an individual,                    |
BEN SACKRIDER and PHILLIP VAN DERMUS d/b/a             |
TRI-COUNTY EXCAVATING,                                 |
                                                       |
MICHAEL E. GABOS and ANN GABOS,                        |
                                                       |
FIFTH THIRD MORTGAGE-MI, LLC, a Delaware Corp., |
                                                       |
DEBORAH A. SPENCE, an individual,                      |
DEBORAH A. SPENCE d/b/a A.C.E. Appraisal,              |
                                                       |
JAMES J. LUYCKX and CAROLYN S. LUYCKX,                 |
                                                       |
CLARKE R. HAIRE, BETTY JANE HAIRE, and                 |
LYNN J. HAIRE,                                         |
                                                       |
     Defendants.              |
                                                       |

_____

**OPINION and ORDER**

**Granting the Capital Defendants' Motion for Summary Judgment and
Denying the Plaintiffs' Cross-Motion for Summary Judgment to this Extent:**

Dismissing Requests for Other-Than-Declaratory/Equitable Relief on These Claims:
Count 7 - Michigan Clean Water Act (NREPA Part 31)
Count 8 - Michigan Soil and Sedimentation Act (NREPA Part 91)
Count 9 - Michigan Inland Lakes and Streams Act (NREPA Part 301)

Dismissing One Tort Claim under *Fultz* for Failure to State a Claim:
Count 14 - Michigan Common-Law Negligence

**Denying the Capital Defendants' Motion for Summary Judgment to this Extent:**

Holding that the Environmental Statutes Permit Private-Citizen Suits on These Claims:

_____

     (claims for enforcement of state environmental-protection statutes), count 10
(statutory nuisance *per se* based on violation of a city stormwater ordinance),
or count 11 (statutory trespass).

Count 7 - Michigan Clean Water Act (NREPA Part 31)
Count 8 - Michigan Soil and Sedimentation Act (NREPA Part 91)
Count 9 - Michigan Inland Lakes and Streams Act (NREPA Part 301)

Holding that the Plaintiffs Have Standing to Pursue These Claims:
Count 7 - Michigan Clean Water Act
Count 8 - Michigan Soil and Sedimentation Act
Count 9 - Michigan Inland Lakes and Streams Act

**Denying Without Prejudice Both Sides' Motions for Summary Judgment on the Merits of:**
Count 7 - Michigan Clean Water Act
Count 8 - Michigan Soil and Sedimentation Act
Count 9 - Michigan Inland Lakes and Streams Act
Count 10 - Michigan Statutory Nuisance *Per Se*
Count 11 - Michigan Statutory Trespass

**Permitting Renewed Motions for Summary Judgment on Counts 7-11 After Discovery**

This case implicates numerous provisions of Michigan's Natural Resource and Environmental Protection Act ("NREPA")[2], which is Chapter 324 of the Michigan Compiled Laws.

---

[2]

**Chapter 324 of the Michigan Compiled Laws is the NREPA.**
**NREPA Article I is entitled General Provisions and covers the following topics:**

| | |
|---|---|
| Part 1 | Short title and General Savings Clauses |
| **Part 3** | **Definitions** |
| Part 5 | Department of Natural Resources |
| Part 7 | Forest and Mineral Resource Development |
| Part 9 | Joint Environmental Management Authorities |
| Part 11 | General Appellate Rights and Public Access to Government |
| Part 13 | Permits |
| Part 15 | Enforcement |
| Part 16 | Enforcement of Laws for Protection of Wild Birds, Wild Animals, and Fish |
| **Part 17** | **Michigan Environmental Protection Act** |
| Part 18 | Uniform Transboundary Pollution Reciprocal Access |
| Part 19 | Natural Resources Trust Fund |
| Part 20 | Michigan Conservation and Recreation Legacy Fund |
| Part 21 | General Real Estate Powers |
| Part 23 | Agriculture and the Environment |
| Part 25 | Environmental Education. |

Counts seven, eight and nine may all implicate NREPA Article I - General Provisions (especially

Part 3 - Definitions and Part 17 - Michigan Environmental Protection Act ("MEPA")). Count seven

implicates NREPA Part 31.[3] Count eight implicates NREPA Article II Chapter 2 - Nonpoint Source

---

[3]**NREPA Article II is Pollution Control. It governs the following topics, *inter alia*:**

Chapter 1        Point Source Pollution Control
**Chapter 2        Non-Point Source Pollution Control**
     Part 81        General Nonpoint Source Pollution Control (reserved)
     Part 82        Conservation Practices
     Part 83        Pesticide Control
     Part 85        Fertilizers
     Part 87        Groundwater and Freshwater Protection
     Part 88        Water Pollution Prevention and Monitoring
     Part 89        Littering
     **Part 91        Soil Erosion & Sedimentation Control (Jodway Count 8)**
          **Sec. 324.9101        Definitions**
          Sec. 324.9102        Repealed eff. Jan. 11, 2001
          Sec. 324.9103        Repealed eff. Jan. 11, 2001
          Sec. 324.9104        Rules
          Sec. 324.9105        Administration and Enforcement of Rules, counties; county
                              enforcing agency; fees; joint enforcement and administration
          **Sec. 324.9106        Soil Erosion and Sedimentation Control Ordinances**
          Sec. 324.9107        Violation of Part; Notification [by local gov. to DEQ and county]
          Sec. 324.9108        Deposits to Assure Installation and Completion of Protective and
                              Corrective Measures
          Sec. 324.9109        Agreements with Conservation District . . . .
          Sec. 324.9110        Designation as Authorized Public Agency . . . .
          Sec. 324.9111        Repealed eff. Jan. 11, 2001
          Sec. 324.9112        Earth Change; permit and regulatory requirements . . . .
          Sec. 324.9113        Injunctions; inspection and investigations
          Sec. 324.9114        Additional Rules
          Sec. 324.9115        Inapplicable Operations
          Sec. 324.9116        Residential property owners; permits; exempted activities
          Sec. 324.9117        Enforcement of act by county or agency; notice
          Sec. 324.9118        Conformance after notice; time
          * * *
     Part 93        Soil Conservation Districts

Chapter 3        Waste Management
Chapter 4        Pollution Prevention

Pollution Control (especially Part 91 – Soil Erosion and Sedimentation Control).[4]  Count nine

implicates NREPA Article III, Chapter 1, Part 301, especially sections 30101, 30102, and 30106.

The plaintiffs also assert many tort claims under Michigan's statutory and common law.

The property at issue in this action is a home and two lakefront lots at 324 Bay Street, in the

---

Chapter 5        Recycling and Related Subjects
Chapter 6        Environmental Funding
**Chapter 7        Remediation**
Chapter 8        Underground Storage Tanks.

[4]**NREPA Article III is Natural Resources Management.  It governs these topics, *i.a.*:**

Chapter 1        Habitat Protection
   **Part 301        Inland Lakes and Streams**
         **Sec. 324.30101              Definitions**
         **Sec. 324.30102              Permits; necessity**
         Sec. 324.30103              Operations not requiring a permit; specific exemptions;
                                          plans and specifications
         Sec. 324.30104              Application for permit; filing; form; contents; fee
         Sec. 324.30104b            Application of 30306(b) to proposed project or application . . . .
         Sec. 324.30105              Posting of items on department website; hearings . . . .
         **Sec. 324.30106              Issuance of permit; prerequisites; contents of permit**
         Sec. 324.30107              Term of permit; renewal; terms and conditions of work . . . .
         Sec. 324.30108              Bulk headlines; establishment, application, jurisdiction
         Sec. 324.30109              Ordinary high water mark; agreements with riparian owners . . . .
         Sec. 324.30110              Rules; hearing; review; proceedings by riparian owners
         Sec. 324.30111              Water frontage and exposed bottomland rights, riparian owners
         Sec. 324.30112              Violations; penalties
         Sec. 324.30113              Land and water management permit fee fund

   Part 303        Wetland Protection
   Part 305        Natural Rivers
   Part 307        Inland Lake Levels
   Part 309        Lake Improvements
   Part 311        Local River Management
   Part 312        Watershed Alliances
   Part 313        Surplus Waters
   Part 315        Dam Safety
   Part 317        Aquifer Protection and Dispute Resolution.

Original Plat of Spring Arbor, located in Boyne City, Charlevoix County, Michigan. As of March

2005, the property was owned by non-parties Michael and Elizabeth Pilobosian; in June 2005, they

sold it to defendants Michael Gabos and Ann Gabos (together "Gabos") for $549,000. *See* Am

Comp ¶¶ 40 & 49. On July 20, 2005, plaintiffs Alaina M. Zanke-Jodway and Timothy M. Jodway

("together "Jodway") made a $649,000 purchase offer to Gabos; the sale closed on August 3, 2005.

*See* Am Comp ¶¶ 1-3, 26, and 50.[5]

Defendant Fifth Third Bank - Michigan, LLC ("Fifth Third") provided the financing for both

the June 2005 Gabos purchase and the Jodway purchase less than two months later. For both

transactions, Fifth Third commissioned and relied on appraisals done by defendant Deborah A.

Spence, a licensed Michigan residential real-estate appraiser, through her company A.C.E. (together

"Spence"). Am Comp ¶¶ 27, 29-30, and 52-53.

The August 3, 2005 Warranty Deed ("the deed") states the property includes three lots. Am

Comp ¶3. Block 4 - Lot 14 is a corner lot which contains their house; the front of the house faces

Bay Street, and the side of house faces Addis Street. Am Comp ¶ 4. Block 1 - Lots 1 and 2 have

---

[5]

The Jodways are represented by Ms. Jodway herself; she is an attorney admitted to the
Michigan Bar, and her filings list her Bar membership number. The Jodways' briefs, written by Ms.
Jodway, contain many factual allegations that are not supported by citations to the parties' affidavit
or deposition testimony as would usually be the case when a party is represented by counsel.

Jodway has, however, filed her own notarized affidavit dated March 13, 2009 along with her
brief supporting her summary-judgment motion and opposing the Capital defendants' cross-motion
for summary judgment. Jodway's affidavit state that she has read said brief, that the facts stated
therein are true and accurate to the best of her personal knowledge unless stated to be based on
information and belief, and that she can competently testify as to those facts if called as a witness.

The affidavit is sufficient to permit the court to treat the brief's factual allegations the same
as allegations that are themselves directly made in an affidavit (or in a deposition) by the plaintiff
in a case where the plaintiff is represented by other counsel.

a steep slope and a bluff, with 23 cement steps leading to a more-gently sloped flat area, and then a boulder ("rip rock") seawall which ranges from five to eight feet high in front of their beachfront. *Id.* ¶¶ 4-5.

Next to Lot 14 (Jodway's house) is an unimproved small triangular lot owned by defendant City of Boyne City ("Boyne City"), a municipal corporation. Am Comp ¶¶ 9-10. During the relevant time period, Boyne City employed these defendants: Mayor/Commissioner Stackus; Commissioners Grunch, Adkison, and Douglas; Public Works Director Jason; City Manager Cain; and Water Department Director Meads. Am Comp ¶¶ 11-19.

Next-door and down-slope from the Jodway property is 320 Bay Street (owned by defendants James J. Luyckx and Carolyn S. Luyckx, together "Luyckx"), which experienced stair washout from water run-off directed down their driveway. Am Comp ¶¶ 35 and 45.

Next-door to and down-slope from the Luyckx property is 318 Bay Street (owned by defendants Clarke R. Haire, Betty Jane Haire, and Lynn J. Haire, collectively "Haire"), which had a private drain from Bay Street through their property which drained into Lake Charlevoix. Am Comp ¶¶ 37 and 46-47.

Although Jodway did not own the property until August 2005, the relevant events began about five months earlier, when defendant City of Boyne City ("the City") searched for a contractor to provide engineering design services and supervise the reconstruction of Bay Street. Am Comp ¶ 40. , prepared Capital's proposal. Am Comp ¶¶ 19-21. On March 2, 2005, defendant Capital Consultants, Inc., submitted a proposal to The City which was prepared by defendants James M. Fox and James E. Hirschenberger, Capital employees who were licensed by the State of Michigan as professional engineers. Capital's proposal read, in pertinent part:

**Bay Street**

The reconstruction of Bay Street from John Street to Addis Street, a length of approximately 600 feet. The improvements will include the reconstruction of the existing seal coat roadway with new HMA pavement, drainage and culvert improvements, [and] sanitary sewer and water main replacement. The sanitary sewer will be replaced on John Street from Michigan Avenue to Bay Street.

The existing roadway is approximately 16 feet wide and the new roadway will likely be replaced at the same width and location. *Although the City has 66 feet of right of way, in this area, some of it is not usable due to the location of the bluff to the lake, and a portion of the existing road may not be in the right of way.* Existing drains to the lake will be utilized where possible. It is not anticipated that new storm outlets to the lake will be included as part of the project.

Defs' MSJ (Doc. No. 58), Ex A at unnumbered page 3 (paragraph break added, emphasis added); *see also* Am Comp ¶ 41 (quoting only the italicized language from the Proposal).

According to Jodway, the "existing drains" referred to in the Capital Proposal were (1) a drainage pipe that ran from a Bay Street catch basin, through the Haires' lakefront property, whose property is "two doors down" from Jodway, and (2) a private catch basin and drain installed by the prior owner of the Jodway property to prevent water run-off from eroding the soil[6] and slop beneath the cement steps of lakefront lots 1 and 2 of the Jodway property. *See* Am Comp ¶ 43.

On April 25, 2005, Boyne City held a Bay Street construction "kick-off meeting", where its Public Works Director discussed the following issues with Capital and its engineers, Fox and Hirschenberger: (1) the existing drainage pipes were inadequate; (2) the City had no right-of-way rights over the Jodway property for laying water pipes and a fire hydrant; (3) the City had no "flowage" easement over the Jodways' Lots 1 and 2 to allow run-off and storm water to drain into Lake Charlevoix; and (4) the project might require "grading" permits. Am Comp ¶¶ 43-44.

---

[6]

NREPA Part 91 defines "soil erosion: as "the wearing of land by the action of wind, water, gravity, or a combination of wind, water, [and/]or gravity." MICH. COMP. LAWS § 324.9101(17).

At a meeting on July 21, 2005 – the day after Jodway made a purchase offer to Gabos – Boyne City, Jason and/or Meads directed Capital to design and install a new catch basin and connect it to the existing catch basin on Jodway Lots 1 and 2, in order to drain neighborhood run-off and storm water from Bay Street over the Jodway property and into the lake. Am Comp ¶ 51.

On August 3, 2005 – the day the Gabos sale to Jodway closed – Capital asked Boyne City to advertise and solicit excavation contractor bids for the Bay Street reconstruction project. Am Comp ¶ 54. On August 17, 2005 – two weeks after Jodway took possession – Boyne City and Capital applied to the Michigan Department of Environmental Quality ("DEQ") for a permit to lay water pipes and a fire hydrant through Jodway's Lot 14 (the corner lot, where their house was located), even though they allegedly knew that the proposed location was not within a valid right of way, Am Comp ¶¶ 55-56.

On August 30, 2005, Boyne City held a Special Commissioners Meeting where Mayor Stackus and Commissioners Grunch, Adkison, and Douglas voted to proceed with the Bay Street reconstruction (as recommended by Jason and Cain). Am Comp ¶ 57. Jodway alleges that the Commissioners knew that Capital's design would encroach on her property rights in three respects: (1) run-off and storm water, which is a "non-point" source of pollution, would be directed through Jodway's lakefront lots and discharged[7] into the lake; (2) the grade and topography of Bay Street and Addis Street would be changed to form a "dip" or bowl for collection of diversion of run-off and storm water from the Luyckx and Haire properties to the Jodway property; and (3) the proposed location of the water pipes and fire hydrant was outside a platted right of way and encroached on Jodway's Lot 14. Am Comp ¶ 57. The commissioners rejected non-party Commissioner Vondra's

---

[7] The term "discharge" means a release of a pollutant or pollutants. 33 U.S.C. § 1362(16).

motion to give notice to Jodway before proceeding with the project. Am Comp ¶ 58. Indeed, on September 2, 2005, shortly before the project started, Boyne City Public Works Director Jason notified all Bay Street residents *except the Jodways* that the project would begin soon. Am Comp ¶ 62-63.

Allegations as to Luyckx and Haire.

As noted above, next-door and down-slope from the Jodway property is defendant Luyckx's property, and next-door and down-slope from that is the Haire property. Am Comp ¶¶ 35, 37 and 45-47. Jodway alleges that on some unspecified date – presumably before the August 30, 2005 commissioners' vote to proceed with Capital's Bay Street reconstruction proposal – the Haires "cut a deal" whereby Boyne City let them drain storm water and run-off through their lakefront property, in exchange for re-directing such effluents from their property and the Luyckx property to the Jodway property. Am Comp ¶ 48.

Allegations Against the Tri-County Defendants.

At the August 30, 2005 Special Commissioners Meeting, Mayor Stackus and Commissioners Grunch, Adkison, and Douglas voted to award the excavation work to defendant Tri-County Excavating ("TriCounty"), whose general partners are defendants Ben Sackrider and Philip Vandermus (collectively "TriCounty"). Am Comp ¶¶ 22 and 59. Although the resulting contract required the City to provide valid property rights over the realty affected by the project, the City and the defendant Commissioners never acquired such rights. Am Comp ¶¶ 60-61.

The project started sometime in September 2005 and finished in May 2006, when TriCounty

cut and removed two cement steps from Jodway's slope, making the first step even with the new

grade on Bay Street; each step had a 5.5-inch riser.  Am Comp ¶¶ 63-64.  As Jodway informed the

City in July 2006, whenever it rained, storm water and run-off directed over her property polluted

their property and caused soil and beach erosion.  Am Comp ¶¶ 65-66.[8]

On June 18, 2007, City Manager Cain (a defendant) and DPW Director Weissner (a non-

party) visited Jodway's lakefront property, but they "fraudulently withheld the fact that" the City

did not have any drainage rights over that property.  Am Comp ¶¶ 70-71.  (Jodway's complaint does

not expressly allege that they spoke with one or both of the Jodways during that visit.)

During a rainstorm on August 21, 2007, Jodway noticed that water was "drain[ed] uphill"

[sic] onto her property from the Luyckx and Haire properties, and told City DPW Director Weissner,

who inspected the drains, along with Capital partner Fox, on August 23.  Am Comp ¶¶ 73-74.  On

August 28, Jodway advised Weissner that the erosion problems once experienced by Luyckx had

now been diverted to her property; she also expressed the opinion that road run-off and stormwater

is a non-point pollution source, and noted that she had raised these concerns with his predecessor

DPW director, defendant Jason.  Am Comp ¶ 74.

Jodway alleges that sometime after August 2007, Capital submitted a proposal to the City

which acknowledged that the City did not have any flowage easement rights over the Jodways'

lakefront property.  Am Comp ¶ 75.

Finally, Jodway alleges that she has commissioned tests which show that "E. Coli" bacteria

---

[8]

Jodway alleges that she contacted the DEQ, which sent someone to inspect the drainpipes on her lakefront property but advised that they lacked jurisdiction to do anything.  She also alleges that she advised the U.S. Army Corps of Engineers ("ACOE") regarding the situation sometime in late 2006, but ACOE did nothing, even though, she contends, Lake Charlevoix falls within its jurisdiction.  *See* Am Comp ¶¶ 67-69.

and "other components of non-point source[9] pollution" flowing onto and through their land are well above legal discharge limits, posing a threat to their health and the public's health.  She claims that the City defendants acted maliciously and recklessly by directing stormwater containing such substances onto the property, because a study they had possessed since 2002 gave them reason to know of the health risks and property devaluation which such non-point-source pollution would inflict on the Jodways.  Am Comp ¶¶ 76-78.


**PROCEDURAL HISTORY**

On September 11, 2008, Jodway filed the original complaint in the Circuit Court of Charlevoix County, Michigan, and all the Boyne City defendants jointly removed the case to this court on October 2, 2008 pursuant to 28 U.S.C. §§ 1441 and 1446.  With their notice of removal, the Boyne City defendants filed the written concurrence of Capital, Fox, and Hirschenberger, who at that time were the only other defendants which had been served and entered an appearance in the case.  Jodway has not contested the timeliness of propriety of the removal.  The original 124-page, 754-paragraph complaint named twenty-five defendants and fifty-one "notice defendants" and asserted thirty-six claims.   Various defendants filed motions to strike or for a more definite statement, and the Magistrate Judge heard oral argument on November 5 and granted the motions on November 6, 2008.  *See* Doc. Nos. 6, 11, 16, 20 and 28 (motions), 42 (minutes), and 43 (order).

On December 8, 2008, Jodway filed her 58-page, 346-paragraph first amended complaint, asserting 25 claims against various combinations of 23 defendants.  *See* Doc. 45.

---

[9]

The term "point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

The defendants filed answers were filed as follows:

| | | |
|---|---|---|
| December 12, 2008 | Doc. 46 | Capital defendants |
| December 19, 2009 | Doc. 47 | TriCounty defendants |
| December 22, 2008 | Doc. 48 | The Haires |
| December 22, 2008 | Doc. 49 | The Luyckxs |
| December 23, 2008 | Doc. 50 | Fifth Third Mortgage - Michigan, LLC |
| December 23, 2008 | Doc. 51 | Deborah Spence and A.C.E. |
| December 30, 2008 | Doc. 52 | Michael E. Gabos and Ann Gabos |
| January 2, 2009 | Doc. 53 | The Boyne City Defendants |

The TriCounty defendants filed amended affirmative defenses on January 16, 2009, *see* Doc. 56.

**Jodway's amended complaint asserts fourteen claims against the Boyne defendants:**

| | |
|---|---|
| Count 1 | 42 U.S.C. § 1983 |
| Count 2 | Michigan Constitution - Contract Clause, Art. 1, Sec. 10 |
| Count 3 | Michigan Constitution - Procedural Due Process |
| Count 4 | Michigan Constitution - Substantive Due Process |
| Count 5 | Michigan Constitution - Equal Protection |
| Count 6 | Inverse Condemnation (*De Facto* Taking)[10] |
| Count 7 | Michigan Clean Water Act - Harmful Interference, M.C.L. § 324.3101 *et seq.* |
| Count 8 | Michigan NREPA - Soil and Sedimentation Act, M.C.L. § 324.9101 *et seq.* |
| Count 9 | Michigan NREPA - Inland Lakes and Streams, M.C.L. § 324.30101 *et seq.* |
| Count 10 | Nuisance *Per Se*, M.C.L. § 125.3407 |
| Count 11 | Statutory Trespass, M.C.L. § 600.2919 |
| | |
| Count 12 | Ejectment (against Boyne City only) |
| Count 13 | Declaratory Judgment to Quiet Title as to Abandoned Platted Right of Way And Title by Adverse Possession of Adjacent Lot (against Boyne City only) |
| | |
| Count 25 | Intentional Infliction of Emotional Distress ("IIED") |

---

[10]

    *Cf., e.g., Drake v. Walton Cty.*, 6 So.3d 717, 720 (Fla. App. 1st Dist. 2009), *rev. denied*, 2009 WL 2989776 (Fla. Sept. 17, 2009), an action for inverse condemnation, trespass, and negligence. The Florida Court of Appeals assumed *arguendo* that county's reconfigurations of adjacent land was done for a proper public purpose, was legitimate under its police powers, and was authorized by statute. Nonetheless, the court held that the county's diversion of water across plaintiff's land constituted a Taking for which the plaintiff had to be compensated, declaring, "Government cannot choose to act and protect one property owner by diverting floodwater onto the property of another without compensating that property owner."

Am Comp at 2-3 and 4.

**Next, Jodway asserts seven claims against Capital** Consultants Inc., Lawrence Fox, and

James E. Hirschenberger (collectively "Capital"):

| | |
|---|---|
| Count 7 | Michigan Clean Water Act - Harmful Interference, M.C.L. § 324.3101 *et seq.* |
| Count 8 | Michigan NREPA - Soil and Sedimentation Act, M.C.L. § 324.9101 *et seq.* |
| Count 9 | Michigan NREPA - Inland Lakes and Streams, M.C.L. § 324.30101 *et seq.* |
| Count 10 | Nuisance *Per Se*, M.C.L. § 125.3407 |
| Count 11 | Statutory Trespass, M.C.L. § 600.2919 |
| Count 14 | Negligence |
| Count 25 | Intentional Infliction of Emotional Distress ("IIED") |

Am Comp at 2-3 and 4.

**Further, Jodway asserts the same seven claims against Tri-County** Excavators Inc., Ben

Sackrider, and Phillip Vandermus (collectively "TriCounty"):

| | |
|---|---|
| Count 7 | Michigan Clean Water Act - Harmful Interference, M.C.L. § 324.3101 *et seq.* |
| Count 8 | Michigan NREPA - Soil and Sedimentation Act, M.C.L. § 324.9101 *et seq.* |
| Count 9 | Michigan NREPA - Inland Lakes and Streams, M.C.L. § 324.30101 *et seq.* |
| Count 10 | Nuisance *Per Se*, M.C.L. § 125.3407 |
| Count 11 | Statutory Trespass, M.C.L. § 600.2919 |
| Count 14 | Negligence |
| Count 25 | Intentional Infliction of Emotional Distress ("IIED") |

Am Comp at 2-3 and 4.

**Jodway asserts six claims against Michael E. Gabos and Ann Gabos** (together "Gabos"):

| | |
|---|---|
| Count 15 | Breach of Contract / Warranty Deed Covenants (Rescission of Purchase K) |
| Count 16 | Breach of Contract / Warranty Deed Covenants (Damages) |
| Count 17 | Fraud in the Inducement (Rescission of Purchase Agreement) |
| Count 18 | Fraud in the Inducement (Damages) |
| Count 19 | Fraudulent Misrepresentation |
| Count 20 | Negligent Misrepresentation |
| Count 25 | Intentional Infliction of Emotional Distress ("IIED") |

Am Comp at 3-4.

**Next, Jodway asserts five claims against Fifth Third Bank ("Fifth Third"), Deborah**

**Spence and Deborah Spence d/b/a A.C.E. Appraisal (together "Spence"):**

| | | |
|---|---|---|
| Count 21 | Fraudulent Misrepresentation and Fraudulent Inducement: Use of Inflated Appraisal in Violation of Consumer Mortgage Loan Act | |
| Count 22 | Rescission of Mortgage Loan | |
| Count 23 | Negligent Misrepresentation and Fraudulent Inducement: Consumer Mortgage Loan Act | |
| Count 24 | Negligence: Breach of Statutory Duty and USAP Professional Standards | |
| Count 25 | Intentional Infliction of Emotional Distress ("IIED") | |

Am Comp at 4.

**Finally, Jodway asserts one claim against the Luckyx and Haire defendants:** Count 10,

Nuisance *Per Se*, M.C.L. § 125.3407. *See* Am Comp at 3.

The Tri-County defendants asserted a cross-claim against the City of Boyne City alone.

**The parties filed motions for summary judgment as follows:**

**February 9, 2009**     **Doc. 58**     **Capital Defendants**
**March 17, 2009**     **Doc. 62**     **Jodway's Opposition and Cross-Motion**

**April 28, 2009**     **Doc. 76**     **The Boyne Defendants Motion for Partial SJ**

**May 5, 2009**     **Doc. 78**     **TriCounty Defendants**
    May 7, 2009     Doc. 80     The Haires' concurrence in TriCounty motion
    May 12, 2009     Doc. 81     Spence/ACE's concurrence in TriCounty motion
**August 20, 2009**     **Doc. 108**     **Jodway's Opposition and Cross-Motion**

**May 13, 2009**     **Doc. 82**     **The Luyckxs**
    May 18, 2009     Doc. 85     The Haires' concurrence in Luyckxs' motion
**Jodway did not file opposition by the August 20, 2009 extended deadline,** *see* **Doc. 106.**

**May 22, 2009**     **Doc. 87**     **Fifth Third**
**Jodway did not file opposition by the August 20, 2009 extended deadline,** *see* **Doc. 106.**

**May 26, 2009**     **Doc. 91**     **Spence/ACE**
**Jodway did not file opposition by the August 20, 2009 extended deadline,** *see* **Doc. 106.**

**July 30, 2009**     **Doc. 107**     **Gabos**
**Jodway did not file opposition by the August 30, 2009 deadline.**

# LEGAL STANDARD:
## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

This court assesses a Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted under the same standard as a Rule 12(c) motion for judgment on the pleadings. *Griffin v. Reznick*, 2008 WL 4741738, *2 (W.D. Mich. Oct. 28, 2008) (Maloney, C.J.) (citing *Zeigler v. Mieskiewicz*, 2008 WL 650335, *2 (S.D. Ohio Mar. 5, 2008) (citing *Lindsay v. Yates*, 498 F.3d 434, 438 (6th Cir. 2007))). Such motions turn on legal issues, not an assessment of the evidence. *Griffin*, 2008 WL 4741738 at *2 (citing *Technology Recycling Corp. v. City of Taylor*, 186 F. App'x 624, 640 n.5 (6th Cir. 2006) (Griffin, J.) ("*Tech Rec*") and *Thomas v. Arn*, 474 U.S. 140, 150 n.8 (1985) ("[M]otions for judgment on the pleadings and dismissal for failure to state a claim on which relief can be granted . . . consist exclusively of issues of law.")). A Rule 12(c) motion is simply one permissible avenue for contending that the complaint should be dismissed because it fails to state a claim on which relief can be granted. *See Griffin*, 2008 WL 4741738 at *2 (citing *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 507 (2006) ("a defense of failure to state a claim upon which can be granted . . . may be made in any pleading . . . or by motion for judgment on the pleadings, or at the trial . . . .") (quoting FED. R. CIV. P. 12(h)(6))).

"Such motions 'presume as a legal matter the lack of any need for an evidentiary hearing . . . .'" *Griffin*, 2008 WL 4741738 at *3 (citing *US v. Raddatz*, 447 U.S. 667, 693-94 (1980)). The court must accept all of the complaint's factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *Tech Rec*, 186 F. App'x at 640 n.5 (citing *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005) ("*PONI*")); *see also Bohanan v. Bridgestone/Firestone No. Am. Tire, LLC*, 260 F. App'x 905, 906 (6th Cir. 2008) (citing *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001)); *Heggie*

*v. Kuzma*, 2009 WL 594908, *9 (W.D. Mich. Mar. 6, 2009) (Maloney, C.J.) ("the court must accept as true all Plaintiff's allegations and construe the complaint liberally in his favor") (citing *Herron v. Harrison*, 203 F.3d 410, 414 (6th Cir. 2000)). But the court need not draw unwarranted factual inferences or accept the plaintiff's *legal* conclusions. *Bohanan*, 260 F. App'x at 906 (citing *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999)).

And each claim's factual allegations must *plausibly* suggest a viable claim; the claim must be plausible and not merely conceivable. *Griffin*, 2008 WL 4741738 at *3 (citing *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 455 (6th Cir. 2007) (en banc) (Sutton, J., joined by Griffin et al.) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, –, 127 S.Ct. 1955, 1974 (2007))). "The 'factual allegations must be enough to raise a right to relief above the speculative level'", not merely create a "'*suspicion* of a legally cognizable cause of action . . . .'" *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (quoting *Twombley*, 550 U.S. at –, 127 S.Ct. at 1974) (internal alterations omitted)).[11] There must be either direct of inferential allegations regarding all the material elements of each claim. *LULAC v. Bredesen*, 500 F.2d 523, 527 (6th Cir. 2007) (McKeague,

---

[11]

Until 2007, our Circuit followed the standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), which directed courts to grant a 12(b)(6) motion "when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint." *Taylor v. Sampson*, 2008 WL 2923435, *2 n.3 (W.D. Mich. July 25, 2008) (Maloney, J.). Lakeland's brief erroneously cites this formulation as current law. *See* P's Opp at 3.

In *Twombley* (2007), the Supreme Court "retired the 'no set of facts' formulation of the Rule 12(b)(6) standard and dismissed an antitrust-conspiracy complaint because it did not contain facts sufficient to 'state a claim to relief that is plausible on its face.'" *Griffin*, 2008 WL 4741738 at *3 n.1 (quoting *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 337 n.4 (6th Cir. 2007) (quoting *Twombley*, 550 U.S. at –, 127 S.Ct. at 1974)). *See also Casden v. Burns*, – F. App'x –, –, 2009 WL 103620, *6 n.5 (6th Cir. Jan. 16, 2009) (C.J. Boggs, <u>Clay</u>, D.J. Bertlesman).

"In some cases, *Twombley* may make it easier . . . to grant 12(b)(6) than the *Conley* standard." *Taylor*, 2008 WL 2923435 at *2 n.3.

J.) (citing *Twombley*, 550 U.S. at –, 127 S.Ct. at 1969).

Our Circuit cautions that district courts should not overstate the hurdle that *Twombley* establishes for plaintiffs to survive a Rule 12(b)(6) or Rule 12(c) motion:

> In *Erickson v. Pardus*, 550 U.S. [89], 127 S.Ct. 2197 . . . (2007) [(p.c.)], decided two weeks after *Twombley*, however, the Supreme Court affirmed that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 2200 (quoting *Twombley*, 127 S.Ct. at 1964). The opinion in *Erickson* reiterated that "when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Id.* (citing *Twombley*, 127 S.Ct. at 1965). We read the *Twombley* and *Erickson* decisions in conjunction with one another when reviewing a district court's decision to grant a motion to dismiss for failure to state a claim or a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12.

*Tucker v. Middleburg-Legacy Place*, 539 F.3d 545, 550 (6th Cir. 2008) (Griffin, J.) (quoting *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295-96 (6th Cir. 2008) (footnote omitted)) (other internal quotation marks and alterations omitted). Nonetheless, "[w]hile a complaint need not contain detailed allegations, [it] must include more than mere labels and conclusions." *Petros v. Sampson*, 2009 WL 2761425, *2 (W.D. Mich. Feb. 4, 2009) (Edgar, J.) (citing, *inter alia*, *Twombley*, 550 U.S. at –, 127 S.Ct. at 1965).

When considering whether to grant a Rule 12(c) or 12(b)(6) motion, the court primarily considers the complaint's allegations, but may also take into account items appearing in the record and attached exhibits. *Poly-Flex Const., Inc. v. NTH, Ltd.*, 582 F. Supp. 892, 901 (W.D. Mich. 2008) (Maloney, C.J.) (citing, *inter alia*, *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001)).

# A FEDERAL COURT'S APPLICATION OF STATE LAW

"'In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court.'" *Appalachian Railcar Servs. v. Boatright Enters., Inc.*, – F. Supp.2d –, –, 2008 WL 828112, *14 (W.D. Mich. 2008) (Paul L. Maloney, J.) ("*ARS*") (quoting *NUFIC of Pittsburgh v. Alticor, Inc.*, 472 F.3d 436, 438 (6th Cir. 2007) (Richard Allen Griffin, J.) (citation omitted)). If the state supreme court has not conclusively decided the issue, a federal court presumptively looks to the decisions of the state's appellate courts: "In anticipating how the state supreme court would rule, 'we look to the decisions of the state's intermediate courts unless we are convinced that the state supreme court would decide the issue differently.'" *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *US v. Lancaster*, 501 F.3d 673, 679 n.3 (6th Cir. 2007) (Griffin, J.) (citation omitted)); *see also West v. AT&T Co.*, 311 U.S. 223, 236-37 (1940) ("A state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them. In those circumstances the federal court is not free to reject the state rule merely because it has not received the sanction of the highest state court . . . .").

In determining what is the controlling law of the State, a federal court also "*may* give weight" to the decisions of the State's trial courts, *Bradley v. GMC*, 512 F.2d 602, 605 (6th Cir. 1975) (citing *Royal Indem. Co. v. Clingan*, 364 F.2d 154 (6th Cir. 1966)), especially when the trial court's decision is consistent with state appellate decisions, *Bradley*, 512 F.2d at 605. The federal court is not *obligated*, however, to follow state trial-court decisions. *Am. Int'l Ins. Co. of P.R. v. Lampe GmbH*, – F. App'x –, –, 2009 WL 59145, *1 (3d Cir. 2009) (citing *Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 199 (3d Cir. 2004)).

## PRECEDENTIAL VALUE OF MICHIGAN DECISIONS

A federal court must accord the same precedential value to a state-court decision as it would be accorded by that state's courts. *See ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *Mutuelle Generale Francaise Vie v. Life Ass. Co. of Pa.*, 688 F. Supp. 386, 397 n.15 (N.D. Ill. 1988) ("[O]ne Supreme Court decision (*Fidelity Union Trust Co. v. Field*, 311 U.S. 169 . . . (1940)) . . . required a federal court to ascribe the same precedential force to a New Jersey trial court decision that such a decision would receive in that state's court system under the peculiarities of New Jersey law.")). If a state court would not be bound by a particular state-court decision, then neither is this court. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *King v. Order of United Commercial Travelers of America*, 333 U.S. 153, 161 (1948) ("a federal court adjudicating a matter of state law in a diversity suit is, in effect, only another court of the State; it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court.") (citation omitted)).

Michigan Court Rule 7.215(C)(2) states that "[a] published decision of the Court of Appeals has precedential value under the rule of stare decisis." This subsection makes no distinction based on when the decision was issued.. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14.

However, Michigan Court Rule 7.215(J)(1) provides that "[a] panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals *issued on or after November 1, 1990*, that has not been reversed or modified by the Supreme Court or by a Special Panel of the Court of Appeals as provided in this rule." . *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (emphasis added).

Synthesizing Michigan Court Rules 7.215(C)(2) and 7.215(J)(1), the Michigan Court of

Appeals accords precedential value to *all* of its prior published decisions, regardless of when they were issued. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14. When a post-November 1, 1990 published Court of Appeals decision conflicts with a *pre*-November 1, 1990 published Court of Appeals decision, however, the *post*-November 1, 1990 decision prevails. *Id.*

When there is a conflict between two published decisions of the Court of Appeals that were *both* issued *after* November 1, 1990, Michigan courts must follow the first opinion that addressed the matter at issue. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W. 2d 546, 554 (Mich. App. 1999) (citation omitted)).

By contrast, Michigan Court of Appeals panels are not bound by *un*published decisions of that same court, regardless of when they were issued. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15 (citing *Iqbal v. Bristol West Ins. Group*, 748 N.W.2d 574, 582 n.5 (Mich. App. 2008) (citing MICH. CT. R. 7.215(J)(1))). Nonetheless, this court may consider and follow unpublished state-court decisions, so long as they do not contradict published decisions of the Michigan Supreme Court or Michigan Court of Appeals. *See Republic-Franklin Ins. Co. v. Bosse*, No. 95-3401, 89 F.3d 835, 1996 WL 301722, *5 n.4 (6th Cir. June 4, 1996) (although unpublished decisions are not generally controlling under Ohio law, "[w]e cite them, nevertheless, due to our sensitivity to state law in deciding diversity cases.") (citing *Royal Indem. Co.*, 364 F.2d at 154 ("Although we are not bound in a diversity case by an unreported decision of a State court of original jurisdiction, we may give weight to this [unreported] decision of the chancery [court] in determining what is the controlling [state] law.")).

Finally, a federal court's interpretation of state law is not binding. *ARS*, – F. Supp.2d at –, 2008 WL 828112 at *14 (citing *Leavitt v. Jane L.*, 518 U.S. 137, 146 (1996) (Stevens, J., dissenting

o.g., joined by Souter, Ginsburg, & Breyer, JJ.) ("[T]he decision of a federal court (even this Court) on a question of state law is not binding on state tribunals . . . .")); *accord McGrath v. Toys 'R Us, Inc.*, 356 F.3d 246, 250 (2d Cir. 2004) (citing *Sargent v. Columbia Forest Prods., Inc.*, 75 F.3d 86, 90 (2d Cir. 1996)); 20 AM. JUR.2D COURTS § 225 (1965).  As our Circuit recently emphasized,

> No federal court has the final say on what [state] law means.  Even the decision of the highest federal court, the United States Supreme Court, about the meaning of [a state] law has no more binding authority on the [state] Supreme Court than the decision of [another State's] Supreme Court or for that matter any other court.

*Ohio ex rel. Skaggs v. Brunner*, 549 F.3d 468, 472 (6th Cir. 2008).

Accordingly, this court will seriously consider our Circuit's interpretation of state law, or another district court's interpretation of state law, but is not bound by it.  *See ARS*, – F. Supp.2d at –, 2008 WL 828112 at *15; *see also Pack v. Damon Corp.*, 2006 WL 1156489, *1 (E.D. Mich. May 1, 2006) ("Michigan courts, in turn, are not bound by the Sixth Circuit's interpretation of Michigan law.").  *See, e.g., Michigan Protection & Advocacy Servs. v. Michigan DOC*, 581 F. Supp.2d 847, 856 (W.D. Mich. 2008) (Maloney, C.J.) ("*MPAS*") (declining to follow U.S. District Court for the Eastern District of Michigan's determination that MDOC is a political subdivision of the State of Michigan, a matter of state law).

**DISCUSSION**
**Count 7 - Michigan Clean Water Act Claim**
(NREPA PART 31, MICH. COMP. LAWS 324.101 *et seq.*)

**Count 8 - Michigan Soil and Sedimentation Act Claim**
(NREPA Part 91, MICH. COMP. LAWS 324.9101 *et seq.*)

**Count 9 - Michigan Inland Lakes and Streams Act Claim**
(NREPA Part 301, MICH. COMP. LAWS 324.30101 *et seq.*)

All three environmental statutory claims ultimately seek, *inter alia*, a declaration that Capital, Fox, Hirschenberger and others' harmful interference with their riparian property rights and recreational uses proximately caused a diminution in the value of their property and impaired the marketability of its title, *see* Am Comp ¶ 183 (count seven); ¶ 192 (count eight); ¶ 206 (count nine), and injunctive relief to restore certain conditions of their property and the adjoining street (Bay Street) to their state prior to the City's reconstruction project.

Defendants do not dispute that the Jodways are riparian owners, defined as persons who have riparian rights, i.e., "those rights which are associated with the ownership of the bank or shore of an inland lake or stream." *See* Am Comp ¶¶ 196-98 (citing MICH. COMP. LAWS § 324.30101(n) and (o)). The Jodways, then, can rely on MICH. COMP. LAWS § 324.30101, which states, in part

> This part [NREPA Part 301] does not deprive a riparian owner of rights associated with his or her ownership of water frontage. A riparian owner among other rights controls any temporarily or periodically exposed bottomland to the water's edge, wherever it may be at any time, and holds the land secure against trespass in the same manner as his or her upland [the land that lies above the ordinary high-water mark, MICH. COMP. LAWS § 324.30101(r)] subject to the public trust to the ordinary high-water mark.

*See* Am Comp ¶¶ 199-200.

The Jodways emphasizes that as riparian owners of lakefront lots 1 and 2, their use of the property includes swimming, which MICH. ADMIN. R. 323.1044(x) defines to constitute "total body contact recreation," and wading, which Michigan Administrative Rule 323.1044(I) defines to constitute "partial body contact recreation." Am Comp ¶¶ 148-51.

The Jodways make a host of other uncontested allegations to show that the persons, entities, and waterways involved are covered by the Clean Water Act. As to the parties, Capital is a "corporation" and its engineers Fox and Hirschenberger are "individuals", and therefore all are

"persons" as defined by 33 U.S.C. § 1362(5). *See* Am Comp ¶¶ 158 and 160-61.

Defendants do not dispute that Lake Charlevoix qualifies as:

−  part of the "waters of the State" under MICH. COMP. LAWS § 324.3101(z) (NREPA Part 31, count seven);

−  part of the "waters of the State" under MICH. COMP. LAWS § 324.9101(20) (NREPA Part 91, count eight);

−  a "surface water of the State" under MICH. ADMIN. R. § 323.1044(u)(I) and (ii);

−  a body of water connecting to the Great Lakes (Lake Michigan) under MICH. COMP. LAWS § 324.3101(g) (NREPA Part 31, count seven);

−  an "inland lake or stream" as defined by MICH. COMP. LAWS § 324.30101(h).

*See* Am Comp ¶¶ 152-54 (waters of the State, surface water of the State, body of water connecting to the Great Lakes) and Am Comp ¶ 195 (inland lake).

**Substantively, for purposes of count seven (Clean Water Act), the Jodways rely on MICH. ADMIN. R. § 323.1100**, which provides as follows:

(1)  *At a minimum, all surface waters of the state are designated and protected for all of the following uses:*

　　(a)  Agriculture.
　　(b)  Navigation.
　　(c)  Industrial water supply.
　　(d)  Warmwater fishery.
　　(e)  Other indigenous aquatic life and wildlife.
　　*(f)*  *Partial body contact recreation.*
　　(g)  Fish consumption.

(2)  *All surface waters of the state are designated and protected for total body contact recreation from May 1 to October 31 in accordance with the provisions of R 323.1062.*

Total body contact recreation immediately downstream of wastewater discharges, areas of significant urban runoff, combined sewer overflows, and areas influenced by certain agricultural practices is contrary to prudent public health and safety practices, even though

water quality standards may be met.

Am Comp ¶ 157 (emphasis added) (final paragraph break added).  The Jodways also rely on MICH.

COMP. LAWS § 324.3109(1), which prohibits persons from directly or indirectly discharging into the

waters of the  State anything that is or may become injurious

> *(a)*    *To the public health, safety, or welfare.*
>
> (b)    *To* domestic, commercial, industrial, agricultural, *recreational*, or other *uses that are being made or may be made of such waters.*
>
> (c)    *To the value or utility of riparian lands.*
>
> (d)    To livestock, wild animals, birds, fish, aquatic life, or plants or to their growth or propagation.
>
> (e)    To the value of fish and game.

Am Comp ¶ 164 (emphasis in complaint).

**For purposes of count nine (Inland Lakes and Streams Act), the Jodways rely on Mich.**

**Comp. Laws § 324.30102**, which provides as follows:

> Except as provided in this part [NREPA Article III, Part 301], *a person without a permit from the department [MDEQ] shall not* do any of the following:
> * * *
> (f)    *Construct, dredge, commence, extend, or enlarge an artificial canal*, channel, ditch, lagoon, pond, lake, or similarly waterway *where the purpose is ultimate connection with an existing inland lake or stream, or where an part of the artificial waterway is located within 500 feet of the ordinary high-water mark of an existing inland lake or stream.*

*See* Am Comp ¶ 201.  The Jodways allege that the Capital defendants and others

> intentionally and concertedly planned, designed and constructed the enlarging of a private drain on Jodways' Lot 14 which [the private drain] is an artificial canal, by connecting a pipe from the new catch basin to the existing catch basin with the ultimate purpose of discharging storm water to Lake Charlevoix and the construction was within 500 feet of Lake Charlevoix.
> * * *
> [They] intentionally failed to request the appropriate permit, and conduct an

environmental impact analysis[,] contrary to MCL 324.30106.

Am Comp ¶¶ 202 and 204.  In turn, MICH. COMP. LAWS § 324.30106, entitled Prerequisite to Issuance of Permit; Specification in Permit, provides that the DEQ shall issue a permit "if it finds that the structure or project will not adversely affect the public trust or riparian rights."  The section delineates the desiderata that must inform the DEQ's decision on a permit for the specified activities within 500 feet of the ordinary high-water mark of an inland lake such as Lake Charlevoix.  It states:

> In passing upon an application, the department shall consider the possible effects of the proposed action upon the inland lake or streak and upon waters from which or into which its waters flow and the uses of all such waters, including uses for recreation, fish and wildlife, aesthetics, local government, agriculture, commerce, and industry.
>
> The department shall not grant a permit if the proposed project or structure will unlawfully impair or destroy any of the waters or other natural resources of the state.

MICH. COMP. LAWS § 324.30106 (concluding that "[t]his part does not modify the rights and responsibilities of any riparian owner to the use of his or her riparian water." and "A permit shall specify that a project completed in accordance with this part [NREPA Article III, Part 301] shall not cause unlawful pollution as defined by [NREPA] part 31.").

The parties disagree over whether the defendant's enlarging of the private drain on their property constitutes a "canal" within the intendment of MICH. COMP. LAWS § 324.30102(f).  The Jodways contend that it *is* a canal, Am Comp ¶ 202, because "[t]he ordinary meaning of 'canal' is pipe, a tubular anatomical passage or an artificial waterway for draining or irrigating land."  Am Comp ¶ 203 (citing Webster's Ninth New Collegiate Dictionary, but not a page number or year for that citation).

Jodways' Allegations as to Lots 1 and 2 (The Lakefront Property).  The Jodways describes their lakefront lots 1 and 2 as consisting of hard-packed sand with an occasional clay pocket, leading

to "shallow crystal[-]clear water" that extends about 100 feet to the deeper waters of Lake Charlevoix. *See* Am Comp ¶ 165. They complain that during "rain events", hundred or perhaps thousands of gallons of brownish-black stormwater visibly deposits on their property, eroding their beachfront, discoloring the otherwise very clear shoreline waters of the Lake, and leaving a lingering unpleasant smell which make their beach unusable for recreation. *See* Am Comp ¶¶ 166-67. Specifically, tests revealed 2,416 colonies of E. Coli bacteria, and a concentration violating Mich. Admin. R. 323.1062(2), which provides that "at no time shall the surface waters protected for total body contact exceed a maximum of 300 E. Coli per 100 milliliters during the sampling event." *See* Am Comp ¶¶ 168-69. The Jodways claim that the Capital defendants violated MICH. COMP. LAWS § 324.3109(1)(a) – prohibiting discharge of substances injurious to the public health, safety and welfare – by causing and allowing such E. Coli concentrations; by allowing the Haires' 6" drains and three other 18"-24"-diameter stormwater pipes to discharge directly into the Lake without proper filtration, velocity decelerators, and interceptors; and by failing to test and post warnings at public beaches about exposure to dangerous levels of E. Coli and other pollutants. *See* Am Comp ¶ 169. The Jodways further claim that the Capital defendants violated MICH. COMP. LAWS § 324.3109(1)(b) – prohibiting discharge of substances which are injurious to recreational and other uses – by diminishing their ability to use their lakefront property and shoreline by sending pollutants from the drainage pipe onto those areas. *See* Am Comp ¶¶ 169 and 170. They also claim that the Capital defendants violated MICH. COMP. LAWS § 324.3109(1)(c) – prohibiting discharge of substances injurious to the value or utility of riparian lands – by diminishing the value and utility of their lakefront lots 1 and 2 by making them a depository for stormwater and pollutants. *See* Am Comp ¶¶ 169 and 171.

Jodways' Allegations as to Lot 14 (The House Lot).  The Jodways charge that the Capital defendants and others "intentionally designed and constructed" a "separate storm system"[12] over Lot 14, where their house is located, to evade MICH. COMP. LAWS § 324.2118(h)'s permit requirements and the Michigan Clean Water Act's regulations governing direct discharges into Lake Charlevoix. *See* Am Comp ¶¶ 172 & 175-76.

Finally, without specifying a particular lot within their property, the Jodways charge that the Capital defendants and others planned, designed, approved, and constructed an "illicit connection," *see* Am Comp ¶ 117, which is defined as "a physical connection to the separate storm water drainage system that (1) primarily conveys illicit discharges (a discharge or seepage that is not composed entirely of storm water or uncontaminated groundwater) into the system and/or (2) is not authorized or permitted by the local authority (where a local authority requires such authorization or permit)."

In count 7, the Jodways seek declarations that the Capital defendants and others have harmfully interfered with their riparian property rights, and that the construction of drains adversely affecting their property is both a private nuisance to the Jodways and a public nuisance *per se*.  The Jodways' prayer for relief under count 7 also asks the court to appoint a special master at the defendants' expense to investigate environmental damages, to award compensatory damages for

---

[12]Michigan statute defines "separate storm sewer system" as

a system of drainage, including, but not limited to, roads, catch basins, curbs, gutters, parking lots, ditches, conduits, pumping devices, or man-made channels, which has the following characteristics:

> (I)     The system is not a combined sewer where storm water mixes with sanitary wastes.

[and]   (ii)     The system is not part of a publicly owned treatment works.

MICH. COMP. LAWS § 324.2118(I).

remediation costs, to award punitive damages, and to assess fines and penalties against all defendants payable to the State of Michigan.

**In their motion for summary judgment on Counts 7, 8 and 9, the Capital defendants contend** that private parties lack authority to sue for damages, attorneys fees and costs, and that the claims therefore must be dismissed as to them. The Jodways respond, with partial success, to that argument, and they successfully demonstrate that they have *standing* as well.

**In their motion for summary judgment on counts 10, 11, and 14 the Capital defendants contend** that Michigan case law does not permit tort claims which essentially allege negligent or reckless performance of a contract unless the defendant owed a duty separate and distinct from its duty to perform under the contract.

The Capital defendants do not seek dismissal or summary judgment on the only other claim asserted against them: Count 25, intentional infliction of emotional distress.

Counts 7-9, Argument 1: The Jodways Have Statutory Authority to Sue to Enforce the NREPA, but Only for Declaratory and Equitable Relief.

First, Capital contends that the Clean Water Act (NREPA Part 31, codified at MICH. COMP. LAWS 324.101 *et seq.*) nowhere authorizes private parties to seek either compensatory damages or injunctive relief. *See* Opening Brief in Support of the Motion for Summary Judgment filed by Capital Consultants Inc., Lawrence Fox, and James Hirschenberger, Doc. No. 58 ("Capital MSJ") at 5. On the contrary, Capital points out, a published Michigan Court of Appeals decision holds that "Part 31 of the NREPA grants to the MDEQ the exclusive authority to protect the waters of this state which require state regulation by the MDEQ." Capital MSJ at 5 (quoting *City of Brighton v.*

*Hamburg Twp.*, 260 Mich. App. 345, 348, 677 N.W.2d 349, 351 (Mich. App. 2004) (P.J. Markey, Saad, Wilder)).[13] Capital also relies on the same panel's statements that "the Legislature expressly gave to the DEQ *exclusive* criminal and civil enforcement authority" and "NREPA grants DEQ power to seek injunctive relief for any violations of NREPA or for any violation of a permit issued by the DEQ under NREPA." Capital MSJ at 5 (quoting *Brighton*, 260 Mich. App. at 354) (emphasis added by Capital).

The Jodways response is twofold.  First, they emphasize that the NREPA itself recognizes that a citizen suit for enforcement "is supplementary to existing administrative and regulatory procedures provided by law."  *See* Opening Brief of the Jodways in Support of their Motion for Summary Judgment and in Opposition to the Capital Defendants' Motion for Summary Judgment ("P's MSJ/Opp") at 12 (quoting Mich. Comp. Laws § 324.1706).  Second, the Jodways characterize Capital's reliance on the Michigan Court of Appeals' decision in *Brighton* as misplaced.  In the Jodways' view, *Brighton* stands not for the proposition that private parties may not sue to enforce the Clean Water Act (NREPA Part 31), but merely for the proposition that no state or municipal body may regulate discharges into the water differently than the MDEQ.  *See* P's MSJ/Opp at 11. The Jodways argue as follows:

> The holding in the case of *City of Brighton v. Hamburg Township*, 260 Mich. App. 345, 348 (2004) involved competing pollutant discharge regulations between Hamburg and the MI-DEQ. Plaintiff-Brighton [sic] sought and received an amended DEQ permit to double the capacity of its wastewater treatment plant located in Hamburg.  The treated wastewater contained pollutants or chemical components that would be discharged into South Ore Lake.  The discharge of any pollutant into waters of the United States is prohibited except in compliance with a permit specifying conditions of the discharge pursuant to the Federal Water Pollution

---

[13]All counsel are advised to cite the Northwestern Reporter (currently, the N.W.2d) in federal court, not the Michigan Reporters.

Control Act Amendments of 1972 ("FWPCA"), 33 U.S.C. § 1251, *et seq.* The FWPCA is commonly known as the "Clean Water Act (CWA)."

> Authority to issue permits under the National Pollutant Discharge Elimination System ("NPDES") is vested in the Administrator of EPA, but that authority may be delegated to states upon application and approval by the EPA. FWCPA § 402(b), 33 U.S.C. § 1342(b). The State of Michigan has been granted authority to administer the NPDES permit program for EPA for sources discharging within the State . . . . Authority for issuing permits is founded on the State's Water Resources Commission Act, M.C.L. § 323.1 *et seq.* (M.S.A. § 3.521 *et seq.*) and procedures for issuance of NPDES permits have been established by the Michigan Water Resources Commission in Administrative Code 1954, AACS 77, R. 323.2101, *et seq. State of Mich. v. City of Allen Park*, 501 F .Supp.2d (E.D. Mich., 1980).

Since 1980, the administration of NPDES permits was transferred to the MI-DEQ per an Executive Reorganization Order, E.R.O. No. 1995-16. MCL 324.99903.

In response to the MI-DEQ granting Brighton's permit amendment for increased discharge, Hamburg enacted an ordinance having more stringent requirements than the MI-DEQ permit. The court held, that the Hamburg ordinance was preempted by the MI-DEQ's regulatory scheme for discharge permits for pollutants into the waters of the State of Michigan. The *Brighton* case does not preclude Jodways' private citizen lawsuit brought pursuant to 33 U.S.C. § 1365, CWA and MCL 324.1701, NREPA. Its holding only preempts competing state and municipal regulation of discharges of pollution in favor of the MI-DEQ.

P's MSJ/Opp at 11-12.

The court agrees with the Jodways that *City of Brighton v. Hamburg Twp.*, 260 Mich. App. 345, 677 N.W.2d 349 (Mich. App. 2004) does not hold, or even intimate, that private citizens lack authority to sue to enforce the Clean Water Act, NREPA Part 31. In pertinent part, *Brighton* reasoned as follows:

> [T]he DEQ is the only agency authorized to grant a discharge permit for waste affluent into the waters of the state, and any person who desires to discharge or dispose of waste or operate a wastewater treatment plant must apply with and obtain a permit from the DEQ. MCL 324.3112(1). As further evidence of the DEQ's broad powers regarding water pollution, the Legislature expressly gave to the DEQ exclusive criminal and civil enforcement authority. Also, NREPA grants to the DEQ

power to seek injunctive relief for any violations of NREPA or for any violation of a permit issued by the DEQ under NREPA.

A careful review of these and other statutory provisions of NREPA lead[s] us to conclude that the Legislature impliedly intended to preempt the field of regulation regarding discharge of waste into the waters of this state and the establishment of discharge effluent limits. Plainly, our Legislature enacted a pervasive regulatory scheme with the DEQ having sole responsibility for regulation of point source discharges into the waters of our state.

\* \* \*

[T]he effective regulation of water pollution requires statewide treatment.

Recognizing this imperative, our Legislature enacted a broad, detailed, and multifaceted legislative scheme to manage "point source pollution control." Clearly, if each municipality, township, and county were able to establish its own effluent discharge limitations, as urged by defendant, "a great deal of uncertainty and confusion would be created."

*Brighton*, 260 Mich. App. at 354-55 and 358-59, 677 N.W.2d at 355 and 356-57 (footnotes 4 and 7 omitted) (internal citation omitted).[14]

Indeed, *Brighton* could not have held that private citizens lack authority to sue to enforce the Michigan Clean Water Act (NREPA Part 31), the Michigan Soil and Sedimentation Act (NREPA Part 91), or the Michigan Inland Lakes and Streams Act (NREPA Part 301), because such a holding would flatly contradict NREPA and other published decisions interpreting NREPA.

As Capital acknowledges, "[i]t is true that Michigan [NREPA], MCL 324.101 *et seq.* broadly

---

[14]

The Michigan courts have cited *Brighton* only twice, and those two decisions provide no guidance here. *See Romeo Plank Investors, LLC v. Macomb Twp.*, No. 266415, 2007 WL 517507, \*3 (Mich. App. Feb. 20, 2007) (p.c.) (P.J. Kelly, Davis, Servitto) (applying Land Division Act) ("It is axiomatic that a township cannot enact an ordinance that directly conflicts with state law, or where a statutory scheme preempts the ordinance by occupying the 'field of regulation' which the municipality seeks to enter."); *City of Taylor v. Detroit Edison Co.*, 689 N.W.2d 482 (Mich. App. 2004) (P.J. Murphy, Richard Allen Griffin, White) (holding that local ordinance requiring company to relocate power lines at its own expense to accommodate road-construction project, did not directly conflict with Michigan Public Service Commission regulations, and that such regulations did not "occupy the field", and also holding that Commission did not have primary jurisdiction), *rev'd*, 715 N.W.2d 28 (Mich. 2006).

The federal courts have never cited *Brighton* in any decision available on WestLaw.

defines who can sue to protect the environment[,] as follows:

> The attorney general or *any person* may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for *declaratory and equitable relief* against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction . . . .

Brief of Capital Consultants Inc., Lawrence Fox, and James Hirschenberger in Reply to Plaintiffs' Response to Capital Defendants' Motion for Summary Judgment, Doc. No. 73 ("Capital's Reply") at 1 (quoting MICH. COMP. LAWS § 324.1701(1)) (emphasis added by Capital).

Indeed, the general definitions for all of the NREPA state, "'Person' means *an individual*, partnership, corporation, association, governmental entity, or other legal entity." MICH. COMP. LAWS 324.301(h).

Moreover, the Michigan Court of Appeals reads the "any person" phrase in this manner when interpreting NREPA Part 17, which is the Michigan Environmental Protection Act ("MEPA"):

> "MEPA provides a cause of action for declaratory or other equitable relief for conduct that is likely to result in the pollution, impairment, or destruction of Michigan's natural resources' and provides for immediate judicial review of allegedly harmful conduct."

*Anglers of Ausable, Inc. v. DEQ*, 770 N.W.2d 359, 372 (Mich. App.2009) (quoting *Preserve the Dunes, Inc. v. DEQ*, 684 N.W.2d 847, 849, 471 Mich. 508, 512 (Mich. 2004) (Corrigan, C.J., for five Justices) and citing MICH. COMP. LAWS §§ 324.1701(2)[15] and 324.1703(1)[16]; *cf.*

---

[15]MICH. COMP. LAWS § 324.1701 (NREPA Article I, Part 17) provides, in its entirety,

(1)     The attorney general or *any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.*

(2)     In granting relief provided by subsection (1), if there is a standard for pollution or

-33-

*DaimlerChrysler Corp. v. State Tax Comm'n*, 753 N.W.2d 605, 611-12 n.24 (Mich.) (interpreting

NREPA Part 55, which "regulates the construction and operation of sources of air pollution", Court

---

> for an antipollution device or procedure, fixed by rule or otherwise, by the state
> or an instrumentality, agency, or political subdivision of the state, the court may:
>
> (a)  Determine the validity, applicability, and reasonableness of the
> standard;
>
> (b)  If a court finds a standard to be deficient, direct the adoption of a
> standard approved and specified by the court.

Emphasis added.

[16]

MICH. COMP. LAWS § 324.1703 (also NREPA Article I, Part 17) provides, in its entirety,

> (1)  When the plaintiff in the action has made a *prima facie* showing that the conduct of
> the defendant has polluted, impaired, or destroyed or is likely to pollute, impair or
> destroy the air, water, or other natural resources or the public trust in these
> resources, the defendant may rebut the *prima facie* showing by the submission of
> evidence to the contrary.
>
> The defendant may also show, by way of an affirmative defense, that there
> is no feasible and prudent alternative to the defendant's conduct and that his
> or her conduct is consistent with the promotion of the public health, safety,
> and welfare in light of the state's paramount concern for the protection of
> its natural resources from pollution, impairment, or destruction.
>
> Except as to the affirmative defense, the principles of burden of proof and
> weight of the evidence generally applicable to civil actions in the circuit
> courts apply to actions brought under this part.
>
> (2)  The court may appoint a master or referee, who shall be a disinterested person and
> technically qualified, to take testimony and make a record and a report of his or her
> findings to the court in the action.
>
> (3)  Costs may be apportioned to the parties if the interests of justice require.

Paragraph breaks added in subsection one.  A plaintiff in a MICH. COMP. LAWS § 324.1701(1) action has
established a *prima facie* case of pollution, impairment or destruction "'when his case is sufficient to
withstand a motion by the defendant that the judge direct a verdict in the defendant's favor.'" *Michigan Bear
Hunters Ass'n, Inc. v. Michigan Nat. Res. Comm'n*, 272 Mich. App. 512, 527, 746 N.W.2d 320, 328 (Mich.
App. 2007) (p.c.) (P.J. Owens, Bandstra, Davis) (quoting, *inter alia*, *Nemeth v. Abonmarche Dev., Inc.*, 457
Mich. 16, 25, 576 N.W.2d 641 (Mich. 1998)).

stated, "the clear import of [MICH. COMP. LAWS § 324.5540] is that part 55 provides additional remedies to the existing remedies for the prevention or control of air pollution, namely *private nuisance suits or citizen suits under MCL 324.1701*.") (emphasis added), *reh'g denied*, 482 Mich. 1004, 756 N.W.2d 71 & 78 (Mich. 2008).

Nonetheless, Capital urges that because the statutes underlying counts 7, 8, and 9 do not expressly authorize private parties to recover compensatory damages or attorneys fees/costs for a violation thereof, those claims must be dismissed in their entirety. This is a *non sequitur*: Capital's argument, while correct about these statutes on this score, merely bars the Jodways from collecting damages or seeking relief of types not specified in the statutes. It does not bar the Jodways from suing *vel non* to enforce the Act by winning other forms of relief from the court, namely "declaratory and equitable relief." In turn, if the Jodways ultimately prevail on one or more of their NREPA claims, this court will have statutory authority to grant them suitable equitable relief. NREPA section 1704, which is part of the MEPA, provides as follows:

(1) *The court may grant temporary and permanent equitable relief or may impose conditions on the defendant that are required to protect the air, water, and other natural resources or the public trust in these resources from pollution, impairment, or destruction.*

(2) If administrative, licensing, or other proceedings are required or available to determine the legality of the defendant's conduct, the court may direct the parties to seek relief in such proceedings.

Proceedings described in this subsection shall be conducted in accordance with and subject to the [Michigan APA, codified at MICH. COMP. LAWS §§ 24.201 - 24.328].

If the court directs parties to seek relief as provided in this section, the court may grant temporary equitable relief if necessary for the protection of the air, water, or other natural resources or the public trust in these resources from pollution, impairment, or destruction.

In addition, the court retains jurisdiction of the action pending completion of the action to determine whether adequate protection from pollution, impairment, or destruction is afforded.

(3)     Upon completion of the proceedings described in this section, the court shall adjudicate the impact of the defendant's conduct on the air, water, or other natural resources , and on the public trust in these resources, in accordance with this part [NREPA Article I, Part 17].  In adjudicating an action, the court may order that additional evidence be taken to the extent necessary to protect the rights recognized in this part.

(4)     If judicial review of an administrative, licensing, or other proceeding is available, notwithstanding the contrary provisions of Act No. 306 of the Public Acts of 1969 pertaining to judicial review, the court originally taking jurisdiction shall maintain jurisdiction for purposes of judicial review.

MICH. COMP. LAWS § 324.1704 (emphasis added).

But the Capital defendants are correct that the Jodways's requests for relief other than declaratory and equitable relief on the environmental statutory claims (counts 7, 8 and 9) must be dismissed.  This includes, for example, compensatory damages, punitive damages, fine or penalties to the State of Michigan, and attorneys fees and costs.   But the NREPA (MEPA) expressly authorizes private citizens to sue to enforce the Act through declaratory and equitable relief; Capital has not identified any statutory provision or case law to the contrary, and the court finds none.

The question then becomes whether the Jodways have *standing* to exercise the express statutory right of private citizens to sue to enforce the Act; the court determines that they do. Standing ensures that a genuine case or controversy is before the court; it requires a demonstration that "'the plaintiff's substantial interest will be detrimentally affected in a manner from the citizenry at large.'" *Lee v. Macomb Cty Bd. of Comm'rs*, 464 Mich. 726, 738-39, 629 N.W.2d 900, 907 (Mich. 2001) (Taylor, J.) (quoting *House Speaker v. Governor (a/k/a Dodak v. State Admin. Bd.)*, 441 Mich. 547, 554, 495 N.W.2d 539, 543 (Mich. 1993) (Robert P. Griffin, J.)).   To establish standing, a

plaintiff must prove three elements.

First, the plaintiff must have suffered an injury in fact, i.e., an invasion of a legally protected interest which is "concrete and particularized" and "actual or imminent" rather than "conjectural" or "hypothetical." *Michigan Citizens for Water Conservation v. Nestle Waters North America, Inc.*, 479 Mich. 280, 294-95, 737 N.W.2d 447, 455 (Mich.) (Taylor, J.) ("*Nestle Waters*"), *reh'g denied*, 480 Mich. 1203, 739 N.W.2d 332 (Mich. 2007). The Jodways meet this first prerequisite for standing, because "'environmental plaintiffs adequately allege injury-in-fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.'" *Nestle Waters*, 737 N.W.2d at 449 (internal citations and quotation marks omitted) (quoting *Nat'l Wildlife Fed'n v. Cleveland Cliffs Iron Co.*, 471 Mich. 608, 684 N.W.2d 800 (Mich. 2004) (citation omitted)). The Jodways have alleged that they use the affected area – the shoreline of Lake Charlevoix in Boyne City, and of course their own lakefront lots – and that the continued alleged increase in stormwater and run-off discharge through their property into the Lake (and the resultant allegedly-unhealthy levels of E. Coli, nitrates, nitrites, and other pollutants) impairs the aesthetic and recreational value of that area for them. *See* P's MSJ/Opp at 12-13, citing Ex C (Water Test Table), Ex. D (Affidavit of Christopher Grobbel), and Exs. H and I (blueprint excerpts)).

Second, there must be a causal connection between the injury complained of and the conduct complained of; the injury has to be "'fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court.'" *Nestle Waters*, 737 N.W.2d at 455 (quoting, *inter alia*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (footnote 29 omitted). The Jodways satisfy this second prerequisite for standing, because they allege

that Capital and others' changing the grade of Bay Street and connecting a new catch-basin with a 12" pipe to the existing catch basin with a 6" outlet caused the flooding of their property and caused additional sediment[17] and pollutants to be directed onto and through their property and thence into the Lake. *See* P's MSJ/Opp at 13.[18] The Jodways further allege that the combination of the new (un-permitted) catch basin and the (un-permitted) Bay Street grade change caused washout and sinkholes in the bluff, cracks in their cement stairs on the bluff and soil erosion around the stairs, the elimination of newly-formed grass, and the transport of landscaping wood chips over 70 feet from the bluff to the Jodways' dock. *See* Am Comp ¶ 190(d, e and g) and P's MSJ/Opp at 15, citing Photo A (flooding), Photo B (washout), and Photo E (woodchip movement). The Jodways allege that the wrongfully caused soil erosion "has caused the top boulder layer" of their sea-wall, which cost them $10,000 to re-build in the Spring of 2006, to "erode and slide." *See* Am Comp ¶ 190(f).

The Jodways further satisfy the causal-nexus requirement by alleging that the accelerated

---

[17]"'Sediment' means solid particulate matter, including both mineral and organic matter, that is in suspension in water, is being transported, or has been removed from its site of origin by the actions of wind, water, or gravity and has been deposited elsewhere." MICH. COMP. LAWS § 324.9101(16).

[18]In so doing, the Jodways claim, Capital et al. committed the following violations of MEPA, which is NREPA Article II, Part 91:

– making an "earth change", as defined by MICH. COMP. LAWS § 324.9101(9), without a permit from the county or local enforcement agency as required by MICH. COMP. LAWS § 324.9112(1);

– causing enlarged drainage by extending the existing 6" catch-basin pipe with a new 12-inch-pipe catch basin, which they characterize as an "artificial channel", without an MDEQ permit as required by MICH. COMP. LAWS § 324.30102, and without a permit application review as required by MICH. COMP. LAWS § 324.30106;

– discharging non-pure stormwater (i.e., water which contributes to a violation of a water-quality standard) without a permit, in violation of 33 U.S.C. § 1342(p)(2)(E).

*See* Am Comp ¶¶ 185-190 and P's MSJ/Opp at 13-16.

erosion in the sand/soil in the bluff was caused by Capital and others' violation of their obligation under MICH. ADMIN. R. 323.1702(1) to "conduct an earth change in a manner that will effectively reduce accelerated soil erosion and resulting sedimentation" and their related obligations under MICH. ADMIN. R. 323.1702(2) and MICH. ADMIN. R. 323.1703. *See* Am Comp ¶ 191.

Third, it must be "likely", not merely "speculative", that the injury will be redressed by a favorable decision. *See Nestle Waters*, 737 N.W.2d at 455 (quoting, *inter alia*, *Lujan*, 504 U.S. at 560-61). The Jodways meet this element of standing as well, because the injunctive relief they seek would redress their injuries and restore their property, their enjoyment of their property and the adjoining lakeshore, and the marketability of their title to their condition before the Bay Street re-grade and associated changes.

Having determined that private citizens are statutorily authorized to sue to enforce the Act to seek declaratory and equitable relief, and that the Jodways have standing to sue, the court next turns to the merits of the environmental statutory claims in counts 7-9 and finds that it would be premature to evaluate those merits in the absence of discovery. This is particularly true given the Capital defendants' incomplete attempt to address the merits of these three claims, particularly to rebut any *prima facie* case that the Jodways may have made on counts seven and eight.

Moreover, as discussed in detail below, the Michigan Supreme Court's *Fultz* tort/contract doctrine does not bar the Jodways' claims to enforce environmental-protection statutes against the Capital defendants in counts 7, 8 and 9.

**DISCUSSION**
**Count 10 - Michigan Statutory Nuisance *Per Se* Claim Against the Capital Defendants**
**Count 11 - Michigan Statutory Trespass Claim Against the Capital Defendants**
**Count 14 - Michigan Common-Law Negligence Claim Against the Capital Defendants**

<u>The Defendants Identify No Binding Precedent for Applying the *Fultz* Tort/Contract Doctrine to Foreclose Statutory Environmental Claims, But *Fultz* Does Foreclose the Tort Claims.</u>

Even if private parties can sue to enforce the NREPA Part 31 (Clean Water), Part 91 (Soil and Sedimentation), and Part 301 (Inland Lakes and Streams), and even if the Jodways in particular have standing to do so on these facts, Capital contends that all these claims nonetheless fail as a matter of law. Relying on *Fultz v. Union-Commerce Assocs.*, 470 Mich. 463 (Mich. 2004) and *Keller Const., Inc. v. UP Engineers & Architects, Inc.*, 2008 WL _____ (Mich. App. _____, 2008), *leave to app. denied* (Mich. Nov. 25, 2008), Capital contends that third-party tort claims do not lie where they essentially allege negligent performance of a contract, unless the third party shows that the defendant owed him a duty separate and distinct from the defendant's contractual obligations. *See* Capital MSJ at 6-7.

It is a legal question whether the Jodways' claims implicate any legal duty of the Capital defendants which is sufficiently "separate and distinct" from its duty to perform under its contract with the City. *See Francisco v. Severance*, No. 279839, 2009 WL 2448184, *1 (Mich. App. Aug. 11, 2009) (p.c.) (P.J. Owens, Talbot, Gleicher) (citing *Fultz*, 683 N.W.2d at 590, 470 Mich. at 463) (citing *Byker v. Mannes*, 641 N.W.2d 210, 214, 465 Mich. 637, 643 (Mich. 2002))).

## Count 10 - Statutory Nuisance Per Se.

The Jodways' nuisance per se claim alleges that the Capital defendants and others violated Boyne City Ordinance 19.30 by planning and implementing the Bay Street reconstruction project, which included the re-grading of Bay Street, the installation of a new catch basin, and the

consequent permanent re-direction of run-off and storm water. *See* Am Comp ¶¶ 209 and 214.

Those actions, allege the Jodways, intentionally caused "the intrusion and influx of run-off and

storm water" containing a "voluminous" amount of non-point-source pollution, without their

consent, leading to loss of soil, turf, and sand; soil contamination; and erosion and sliding of their

newly re-built boulder seawall. *See* Am Comp ¶¶ 213 and 215. City Ordinance 19.30 reads as

follows:

> Storm Water Management
>
> *Appropriate measures shall be taken to ensure that removal of surface waters will not adversely affect neighboring properties* or the public storm drainage system. *Provisions shall be made to accommodate storm water which complements the natural drainage patterns* and wetlands, prevent erosion and the formation of dust.
>
> Sharing of storm facilities with adjacent properties shall be encouraged. The use of detention/retention ponds may be required.
>
> Surface water on all paved areas shall be collected at intervals so that it will not obstruct the flow of vehicular or pedestrian traffic or create standing water. All such measures will comply with the Charlevoix County Storm Water Ordinance.

*See* Am Comp ¶ 208 (emphasis added by Jodway, paragraph break added by Court).

The Jodways rely on a Michigan state statute which provides that certain violations of a

zoning ordinance are a nuisance *per se* which must be abated. *See* Am Comp ¶ 211 (citing Mich.

Comp. Laws § 125.3407). The zoning nuisance *per se* statute provides as follows,

> Except as otherwise provided by law, *a use of land* or a dwelling, building, or structure, including a tent or recreational vehicle, used, erected, altered, razed, or converted *in violation of a zoning ordinance or regulation adopted under this act [the Michigan Zoning Enabling Act, Mich. Comp. Laws § 125.3101 et seq.] is a nuisance per se.* The court shall ordered the nuisance abated, and the owner or agent in charge of the dwelling, building, structure, tent, recreational vehicle, or land is liable for maintaining a nuisance *per se*.
>
> The legislative body shall[,] in the zoning ordinance enacted under this act[,] designate the proper official or officials who shall administer and enforce the zoning

ordinance and do 1 of the following for each violation of the zoning ordinance:

> (a)    Impose a penalty for the violation.
>
> [or]  (b)    Designate the violation as a municipal civil infraction and impose a civil fine for the violation.

MICH. COMP. LAWS § 125.3407 (paragraph breaks added, emphasis added).[19]

For a zoning violation to fall within the purview of this nuisance *per se* statute, the zoning ordinance violated must have been enacted under the Michigan Zoning Enabling Act, MICH. COMP. LAWS § 125.3101 *et seq.* *See Ypsilanti Charter Twp. v. Kircher*, 281 Mich. App. 251, 278 n.8, 761 N.W.2d 761, 779 n.8 (Mich. App. 2008) (P.J. Mark Cavanagh, Jansen, Kelly) ("It is true that certain violations of local ordinances enacted under the Michigan Zoning Enabling Act, MICH. COMP. LAWS § 125.3101 *et seq.*, are presumptively classified as nuisances *per se*. However, the Ypsilanti Charter Township property maintenance code was not enacted under the Michigan Zoning Enabling Act."). **Neither the Jodways nor the Capital defendants provide argument or evidence as to whether the allegedly-violated Storm Water Management Ordinance was enacted under the Michigan Zoning Enabling Act. This alone precludes summary judgment for the Jodways on count 10, as they would bear the burden of proof on that element of the statutory zoning-**

---

[19]Moreover, "[a] nuisance arising from the violation of an ordinance is by its nature a public nuisance." *Gawrych v. Rubin*, No. 267447, 2006 WL 2035649, *1 (Mich. App. July 20, 2006) (p.c.) (P.J. Neff, Bandstra, Zahra) (citing *Towne v. Harr*, 185 Mich. App. 230, 232, 460 N.W.2d 596 (Mich. App. 1990)).

A public nuisance is an unreasonable interference with a common right enjoyed by the general public, and includes conduct which (1) significantly interferes with the public's health, safety, peace, comfort, or convenience; *or* (2) is proscribed by law; *or* (3) was known, or should have been known by the actor to be of a continuing nature which produces a permanent or long-lasting significant effect on the public's rights. *Gawrych*, 2006 WL 2035649 at *1 (citing *Cloverleaf Car Co. v. Phillips Petroleum Co.*, 213 Mich. App. 186, 190, 540 N.W.2d 297 (Mich. App. 1995)).

**nuisance *per se* claim at trial.** This also eliminates one possible avenue for the Capital defendants to win summary judgment on that claim.

The Capital defendants make <u>no</u> attempt to address the merits of the Jodways' statutory zoning-nuisance *per se* claim (count 10). *See* Defs' Opening Brief in Support of SJ (Doc. 58) at 12; Defs' Reply (Doc. 73); Defs' Supp. Reply (Doc. 75). Thus, based on the Capital defendants' current briefs, if the court rejects their argument that all tort claims are foreclosed as a matter of law by the *Fultz* tort/contract doctrine, they have done nothing either to win summary judgment or to withstand summary judgment on count 10.

**Nonetheless, the court agrees with the Capital defendants that the Jodways' nuisance *per se* claim is foreclosed by the *Fultz* tort/contract doctrine for the reasons explained below.**

## Count 11 - Statutory Trespass

The Jodways claim that the Capital defendants and others committed trespass in violation of MICH. COMP. LAWS § 600.2919, which states, in pertinent part:

(1) **Treble and Single Damages**. *Any person who*:

> (a) cuts down or carries off any wood, underwood, trees, or timber or despoils or injures any trees on another's lands, or

> (b) *digs up or carries away stone, ore, gravel, clay, sand, turf*, or mould or any root, fruit or plant *from another's lands*, or

> (c) cuts down or carries away any grass, hay, or any kind of grain from another's lands

*without the permission of the owner of the lands*, or on the lands or commons of any city, township, village, or other public corporation without license to do so, *is liable to the owner of the land* or the public corporation *for 3 times the amount of actual damages.*

If upon the trial of an action under this provision or any other action for trespass on lands it appears that the trespass was casual and involuntary, or that the defendant had probable cause to believe that the land on which the trespass was committed was his own, or that the wood, trees, or timber taken were taken for the purpose of making or repairing any public road or bridge[,] judgment shall be given for the amount of single damages only.

(2) **Waste by holder of present estate; double damages.** * * *

(3) **Threatened Waste; Injunction; Damages.**

      (a)    *The circuit court shall grant injunctions to stay and prevent threatened trespass* where the remedies provided by subsection (1), above, are not fully adequate and *in any case where the trespass is of a continuing nature.*

(4) **Waste after commencement of action, restraining order, contempt.** * * *

(5) **Waste on land under levy; restraining order; contempt.** * * *

(6) **Land sold on execution, liability on person entitled to possession, acts after sale not waste.** * * *

MICH. COMP. LAWS § 600.2919 (boldface original, italics added, final ¶ break in subsection 1 added).[20]

---

[20]*Cf.* MICH. COMP. LAWS § 750.546, which provides as follows:

Wilful [sic] Trespass By Cutting or Destroying Wood, Gravel, Grain, Etc.

*Any person who shall wilfully [sic] commit any trespass,* by cutting down or destroying any timber or wood, standing or growing on the land of another, or by carrying away any kind of timber or wood, cut down or lying on such land, or *by digging up or carrying away any stone, ore, gravel, clay, sand, turf or mould from such land,* or any root, fruit or plant there being, or by cutting down or carrying away any grass, hay, or any kind of grain standing, growing or being on such land, ro by carrying away from any wharf or landing place, railroad depot or warehouse, any goods whatever in which he has no interest or property, *without the license of the owner, of the value of 5 dollars or more, shall be guilty of a misdemeanor.*

Emphasis added.

It is well established that Michigan law permits a statutory trespass action to redress the diversion of waters onto an adjoining property without the consent of that property owner. In *Philippou v. CMC Investments*, Nos. 261781 and 262612, 2006 WL 3371729 (Mich. App. Nov. 21, 2006) (p.c.) (P.J. Murphy, Meter, Davis), a Michigan Court of Appeals reviewed some of the case law in this area, and illustrated the type of facts which can give rise to liability for "water" trespass under MICH. COMP. LAWS § 600.2919. Affirming summary judgment for a plaintiff under that section, the panel explained that the defendant owned land

> adjacent to and west of plaintiffs' property. Both properties are bordered at the north by Michigan Avenue. This dispute arises out of surface water runoff from defendants' and onto plaintiffs' property. The trial court found that defendants "created or gave permission for others to create an artificial ditch" on their land, resulting in an alteration of "the historic and natural flow of off-site water from" a culvert running under Michigan Avenue.
>
> The court further found that the redirected water constituted a continuing trespass and issued an injunction against further water runoff exceeding its historical before defendants improved their property. The trial court held a bench trial on damages and accepted expert witness William Lawrence's valuation of the trees killed by flooding and the cost of restoration. The trial court awarded plaintiffs $79,948.50, based on trebling of that evaluation.
>
> * * *
>
> * * * It is manifest that owners of a "lower or servient estate must receive the surface water from the upper or dominant estate in its natural flow." *Bennett v. Eaton Co*, 340 Mich. 330, 335-36, 65 N.W.2d 794 (1954); *Schmidt v. Eger*, 94 Mich. App. 728, 738, 289 N.W.2d 851 (1980).
>
> But a landowner may not divert surface water to adjoining property by artificial means where that water had not previously flowed to the latter property. *See Allen v. Morris Bldg. Co*, 360 Mich. 214, 215-17, 103 N.W.2d 491 (1960); *Feldkamp v. Ernst*, 177 Mich. 550, 143 N.W. 887 (1913).[21] Liability may be imposed for artificial water diversion. *See Finkbinder v. Ernst*, 135 Mich. 226, 97 N.W. 684 (1903).

---

[21]

*See also generally Tittiger v. Johnson*, 103 Mich. App. 437, 443, 303 N.W.2d 26 (Mich. App. 1981) ("[A] servient degree is not to be burdened to a greater extent than was contemplated at the time of the creation of the easement.") (citing *Barbaresos v. Casaszar*, 325 Mich. 1, 37 N.W.2d 689 (1949) and *Bang v. Forman*, 244 Mich. 571, 222 N.W. 96 (Mich. 1928)).

            * * * "The owner of the dominant estate may not, by changing the conditions on his land, put a greater burden on the servient estate by increasing and concentrating the volume and velocity of the surface water." *Lewallen v. Niles*, 86 Mich. App. 332, 334, 272 N.W.2d 350 (1978); *see also Allen,* [360 Mich.] at 217; *Bennett,* [340 Mich.] at 336; *Schmidt,* [94 Mich. App.] at 338. This willful clearing, "causing waters in excess of natural flowage . . . to be channeled and concentrated onto plaintiffs' property to their damage, is enough to warrant recovery for plaintiff[s]." *Allen*, [360 Mich.] at 217.

            * * * Defendants argue that the Washtenaw County Road Commission was the party actually responsible for making the changes to the property. However, to be adjudged liable, an actor "must have taken some action or position in furtherance of the trespass." *Kratze v. Independent Order of Oddfellows*, 190 Mich. App. 38, 45, 475 N.W.2d 405 (1991), *rev'd in part on other grounds*[,] 442 Mich. 136 (1993). Defendants' authorization was sufficient to give rise to their liability, so the trial court's grant of summary disposition was appropriate.

*Philippou*, 2006 WL 3371729 at *1, *2 (some paragraph breaks added).[22]

Section 600.2919 expressly authorizes an award of attorney fees to a prevailing claimant. *See Acho v. Bok Yeon Kim*, No. 284997, 2426308, *5 (Mich. App. Aug. 6, 2009) (p.c.) (P.J. Servitto, O'Connell, Zahra). However, section 600.2919's double- and treble-damages provision multiplies only the actual compensatory damages, not any attorneys fees or costs which may be awarded. *See Semaan v. Smith Bldg. & Dev. Corp.*, No. 284284, 2009 WL 2448165, *6 (Mich. App. Aug. 11, 2009) (p.c.) (P.J. Saad, Sawyer, Borrello) ("[O]n remand, if the trial court finds that defendants' actions constituted a trespass under MCL 600.2919(c), it may treble the damages as a result of the trespass and under MCL 600.2919(a) [it] may treble the damages to the trees, but it may not treble attorney fees and costs.") (citing MICH. COMP. LAWS § 600.2919(c)).

---

[22]

        *Cf. Parr v. Serra*, No. 254322, 2005 WL 3556117 (Mich. App. Dec. 29, 2005) (p.c.) (P.J. Hoekstra, Gage, Wilder) (affirming summary disposition for plaintiff on MICH. COMP. LAWS § 600.2919 intentional-trespass claim against neighbors whose construction and excavation damaged plaintiff's deck).

The Jodways allege that Capital *et al.* committed intentional trespass by doing the following, as part of the Bay Street reconstruction project, between September 7, 2005 and June 2006:

– "laying the water service pipe and fire hydrant through Lot 14 of Jodways' property knowing that the water pipe was not within the platted right of way and would expand prior usage;"

– "knowingly and intentionally misrepresenting to the DEQ", in the application submitted to the DEQ on August 17, 2005 by Boyne City, Meads, Capital and Hirschenberger, "under penalty of perjury that the proposed water pipe location was within a valid right of way";

– "installing a new catch basin with a 12" underground pipe that was deliberately connected to the existing catch basin on the Jodways' property having a 6" discharge outlet";

– "removing sand, soil, turf and two (2) cement steps in lowering the grade of Bay Street as evidence by the topography graph and the Jodways' property adjacent thereto";

– "[w]hile trespassing . . . intentionally, recklessly and wantonly" digging up, removing, and carrying away the Jodways' sand, soil, turf, cement steps and sprinkler system.

Am Comp ¶¶ 217-218.

As with count 10 (statutory nuisance per se), **the Capital defendants make <u>no</u> attempt to address the merits of the Jodways' statutory trespass claim (count 11) and show a genuine issue as to whether their conduct constituted a violation of MICH. COMP. LAWS § 600.2919.** *See* Defs' Opening Brief in Support of SJ (Doc. 58) at 13; Defs' Reply (Doc. 73); Defs' Supp. Reply (Doc. 75). Thus, based on the Capital defendants' current briefs, if the court rejects their argument that all tort claims are foreclosed as a matter of law by the *Fultz* tort/contract doctrine, they have done nothing either to win summary judgment or to withstand summary judgment on count 11.

**Nonetheless, the court agrees with the Capital defendants that the Jodways' statutory trespass claim is foreclosed by the *Fultz* tort/contract doctrine for the reasons explained below.**

# Count 14 - Negligence

The Jodways begin count 14 by noting their belief that Capital, Fox, and Hirschenberger are certified contractors under the State of Michigan's DEQ/DNR Michigan Coastal Management Program, and that Fox and Hirschenberger are Michigan-licensed engineers. *See* Am Comp ¶¶ 253 and 255. The Jodways claim that the Capital defendants were negligent, under Michigan common law, by factually and proximately causing damage to the Jodways by failing to adhere to customary, prudent engineering-industry standards and practices in the following ways:

    –    designing and/or installing a new catch basin and 12" pipe, and connecting it to the pre-existing catch basin which had a 6" pipe draining into the Lake, even though they knew that was not appropriate or adequate;[23]

    –    failing to perform "proper storm-water calculations";

    –    failing to "double check the blueprints to ensure drainage adequacy" and prevent flooding and erosion of the Jodways' land;[24]

---

[23]

    *Contrast Hocking v. City of Dodgeville*, 768 N.W.2d 552, 559 (Wis. 2009) ("[T]he defendants' conduct did not involve a use of their property that altered the flow of surface water. Therefore, their use is not unreasonable, and they have no duty to abate in the first instance. * * * They did not create the flow of rainwater or alter the property so as to create this problem on the Hockings' property. * * * The defendants, for example, did not create a trench that increased the flow of water to the Hockings' property. The defendants did not point oversized downspouts at the Hockings' property. The defendants did not landscape in such a way [as] to unreasonably increase water flow to the Hockings' property. The defendants could not reasonably be required to take positive action that would affect rainwater runoff onto the Hockings' property.")

[24]

    *Cf. Water Works & Sewer Bd. of City of Birmingham v. Inland Lake Investments, LLC*, No. 1070030, – So.3d – , 2009 WL 2723203, *1 (Ala. Aug. 28, 2009), where the plaintiff alleged that each time it rained, the set-up of the defendant's construction project on neighboring land caused plaintiff's lake (which was used for drinking water) to be inundated with new sediment. The plaintiff asserted state-law claims for continuing trespass, private nuisance, public nuisance, negligence and wantonness. The Supreme Court of Alabama unanimously held that it was entitled to a preliminary injunction against the defendant continuing the construction in a way that would continue such sediment discharges. *Water Works*, 2009 WL 2723203 at *5.

–      failing to obtain "flowage easement rights" over the Jodways' lake front property;

–      failing to obtain the legally required permits;

–      failing to treat stormwater, which they knew or had reason to know is a non-point-source of pollution, before sending it onto and through the Jodways' property.

Am Comp ¶¶ 256-263.

As with counts 10 (statutory zoning-nuisance per se) and 11 (statutory trespass), **the Capital defendants make _no_ attempt to address the merits of the Jodways' negligence claim (count 14), i.e. to show a genuine issue as to whether their conduct was negligent under Michigan common law**. *See* Defs' Opening Brief in Support of SJ (Doc. 58) at 14; Defs' Reply (Doc. 73); Defs' Supp. Reply (Doc. 75).  Thus, based on the Capital defendants' current briefs, if the court rejects their argument that all tort claims are foreclosed as a matter of law by the *Fultz* tort/contract doctrine, they have done nothing either to win summary judgment or to withstand summary judgment on count 14.

---

The state Supreme Court emphasized that the rain-induced discharges occurred "*because of [the defendant]'s failure to take steps to curtail the effects of runoff and erosion from its property.*" *Id.* at *6 (emphasis added).  The Court also noted the following, implicating an issue raised by the Jodways in our case:

> The Alabama Department of Environmental Management ("ADEM") *requires* developers of commercial or residential property to obtain *a National Pollutant Discharge Elimination System ("NPDES") permit before starting a project.  Before ADEM approves such a permit, the developer must submit a sediment and erosion control plan that details the best management practices ("BMPs") [which] the developer will use to minimize soil runoff and erosion.*  BMPs are structural and nonstructural controls implemented to prevent erosion and to control sediment runoff.  They include, among other measures, mulch, grass, hay bales, trees, and fences. [The defendant] began its construction without applying for or receiving an NPDES permit.

*Water Works*, 2009 WL 2723203 at *1 (emphasis added).

Nonetheless, the court agrees with the Capital defendants that the Jodways' negligence claim is foreclosed by the *Fultz* tort/contract doctrine for the reasons explained below.

Because there is a less-than-bright line between tort and contract claims in some situations, an extensive review of the Michigan case law over the years is helpful to an informed ruling. Until recently, the seminal decision on these issues in the modern era was *Hart v. Ludwig*, 79 N.W.2d 895 (Mich. 1956). Hart and other orchard owners sued Ludwig for "refusing and neglecting" to abide by an oral agreement to care for their trees. Specifically, Ludwig worked the orchard during the spring of 1952, but sometime during the 1953 season he stopped removing shutes, pruning, fertilizing, and protecting the trees against animals. *Hart*, 79 N.W.2d at 896. The orchard owners sued Ludwig for negligence, and the Michigan Supreme Court squarely confronted the question, "we have, clearly, an action in tort, arising out of breach of contract. Can it be maintained?" *Id.*

Reviewing the common law from our forefathers in Great Britain and early America, the Supreme Court noted that courts had gradually drawn this distinction: when someone undertakes to perform work under an agreement, he can be held liable in tort for "misfeasance", i.e., if he performs poorly, carelessly, or incompletely, but no tort action will lie for "nonfeasance,", i.e., if he simply does nothing to render the promised performance. *See Hart*, 79 N.W.2d at 896-97. Acknowledging that the line between contract and tort actions was sometimes unclear, the Supreme Court enunciated the following two-pronged principle:

> When the cause of action arises merely from a breach of promise, the action is in contract. The action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of a promise. Otherwise, the failure to meet a [promissory] note or any other promise to pay money, would sustain a suit in tort for negligence, and thus the promisor be made liable for all the consequential damages arising from such failure. [1] *As a general rule, there must be some active*

> *negligence or misfeasance to support tort.* [2] *There must be some breach of duty distinct from breach of contract.*

*Hart*, 79 N.W.2d at 897. Applying this rule to the facts at hand, the Court held that the orchard owners could *not* bring a tort claim against Ludwig for discontinuing his promised efforts. Quoting the first edition of Prosser's Handbook on the Law of Torts, the Court declared that

> "if a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not."

> Before us, however, we have not such a case. We have simply the violation of a promise to perform the agreement. The only duty, other than that voluntarily assumed in the contract . . . , was his duty to perform the promise in a careful and skillful manner without risk of harm to others, the violation of which is not alleged. What we are left with is defendant's failure to complete his contracted-for performance. This is not a duty imposed by the law upon all, the violation of which gives rise to a tort action, but a duty arising out of the intentions of the parties themselves and owed only to those specific individuals to whom the promise runs. A tort action will not lie.

*Id.* at 898-99.

**About thirty years later, the Michigan Supreme Court reaffirmed *Hart* in a different context. In *Owens v. Auto-Owners Ins. Co.*, 374 N.W.2d 905 (Mich. 1985),** a girl was injured in an automobile accident, and her parents sued their no-fault insurer. *Owens*, 374 N.W.2d at 906. The insurer paid her ambulance and hospital expenses, but refused to pay replacement benefits, which the parents contended was not only a breach of the insurance contract but also a tort – the intentional infliction of emotional distress. *Id.* at 906.

The insurer tried to rely on *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50 (Mich. 1980), where the Court held that (1) a disability insurance policy did not involve matters of mental concern and solicitude that would justify an award of mental-distress damages for its breach, *see Owens*, 374 N.W.2d at 907 (quoting *Kewin*, 295 N.W.2d 50) (footnote 5 omitted), and (2) exemplary damages

were not recoverable for breach of a commercial contract "'absent allegation and proof of tortious conduct existing independent of the breach [of the contract].'" *Owens*, 374 N.W.2d at 907-08 (quoting *Kewin*, 295 N.W.2d at 50, and citing *Valentine v. Gen. Am. Credit, Inc.*, 362 N.W.2d 628, 633 (Mich. 1984) (employee could not recover mental-distress damages for breach of employment contract, and he could not recover exemplary damages unless he pled purposeful tortious conduct)).

The *Owens* Court noted that *Kewin* had left open the question whether a separate tort claim for intentional infliction of emotional distress may be brought on the basis of an insurer's dilatory handling of a claim. *Owens*, 374 N.W.2d at 908 (footnote 6 omitted). In considering that question, the Supreme Court harkened back to *Hart v. Ludwig* (Mich. 1956):

> The action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of a promise * * *
>
> As a general rule, there must be some active negligence or malfeasance to support tort. *There must be some breach of duty distinct from breach of contract.* * * *

*Owens*, 374 N.W.2d at 909 (quoting *Hart*, 79 N.W.2d at 895 (quoting *Tuttle Gilbert Mfg. Co.*, 13 N.E.465 (Mass. 1887)) (emphasis added).

**The Michigan Supreme Court revisited the contract/tort issue six years later in *Ferrett v. GMC*, 475 N.W.2d 243 (Mich. 1991)**, where General Motors fired an employee for excessive absenteeism, and he sued them for breach of contract and the putative tort of negligent performance evaluation. *Ferrett*, 475 N.W.2d at 244-45. The Michigan Supreme Court held that the allegedly negligent evaluation was not actionable in tort:

> Ferrett complains essentially that GM failed to perform an asserted obligation, arising out of the procedures set forth in the employee handbook, to undertake a third Performance Improvement Plan when he failed to maintain an acceptable attendance record following the completion of the second ninety-day Performance Improvement Plan. In *Hart* [*v. Ludwig*, 79 N.W.2d 895 (Mich. 1956)], this court held that an

action in tort may not be maintained for failure to perform a contract.

> We have simply the violation of a promise to perform the agreement. The only duty, other than that voluntarily assumed in the contract . . . , was his duty to perform the promise in a careful and skillful manner without risk of harm to others, the violation of which is not alleged. What we are left with is defendant's failure to complete his contracted-for performance. This is not a duty imposed by the law upon all, the violation of which gives rise to a tort action, but a duty arising out of the intentions of the parties themselves and owed only to those specific individuals to whom the promise runs. A tort action will not lie.

* * *

In the instant case, as in *Hart*, what we are left with is defendant's [alleged failure to complete his contracted-for performance. Here, as there, the contracted-for performance is not a duty imposed by the law upon all, but, rather, a duty arising out of the intentions of the parties themselves only to the those [sic] specific individuals to whom the promise runs.

* * *

Absent an employer's agreement to provide job security or to discharge only for cause, the employment relationship is at the will of both parties. Ferrett was essentially an at-will employee – his employment was month to month – and therefore he did not have a contractual right to be evaluated or correctly evaluated before the employer exercised its right to discharge him at will.

Just as the law did not impose on the person who agreed to work the orchard in *Hart v. Ludwig* a duty to complete the contracted-for performance . . . neither does it impose on GM a common-law obligation to evaluate or correctly evaluate Ferrett before exercising its right to discharge him at will. There is, thus, no right arising at common law as a matter of public policy, separate and distinct from any contractual right, to be evaluated or correctly evaluated before being discharged from employment.

*Ferrett*, 475 N.W.2d at 247, 248 (internal citations, quotation marks, and footnotes omitted). The

Michigan Supreme Court noted approvingly that

> [c]ases recognizing a right to maintain an action in tort arising out of a breach of contract by the defendant, generally involve a separate and distinct duty imposed by law for the benefit of plaintiff that provides a right to maintain an action without regard to whether there was a contractual relationship between the plaintiff and the defendant.

In *Clark v. Dalman,* [150 N.W.2d 755 (Mich. 1967)], the duty "imposed by law" was

> "the general of a contractor to act so as not to unreasonably endanger the well-being of employees of either subcontractors or inspectors, or anyone else lawfully on the site . . . ."

> *We conclude that because there is no separate and distinct duty imposed by law to evaluate or correctly evaluate employees, Ferrett cannot maintain an action in tort against GM . . . .*

*Ferrett*, 475 N.W.2d at 248 (emphasis added).

**Five years after *Ferrett* (1991), the Supreme Court seemingly continued to adhere to the *Hart - Ferrett* approach in *Corl v. Huron Castings, Inc.*, 544 N.W.2d 278 (Mich. 1996).** Writing for a four-member majority including Justices Brickley, Mallett, and Weaver, Justice Riley stated:

> Similarly [to *Ferrett* (Mich. 1991)], in the present case, we are confronted with an employer who impliedly contracted to terminate his employee [only] for just cause. The jury held that defendant failed to fulfill his duty. This duty, however, was not imposed upon "all", but only upon [defendant], who impliedly contracted with [plaintiff]. Therefore, we conclude that defendant's liability does not arise in tort.

*Id.* at 281 (footnotes 11 and 12 omitted).

**The year after *Corl*, the Michigan Supreme Court issued *Rinaldo's Const. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647 (Mich. 1997).** Rinaldo's experienced serious problems with its telephone service after it moved to a new address, and it sued Michigan Bell on theories of negligence, *res ipsa loquitur*, and willful misrepresentation. *Rinaldo's*, 559 N.W.2d at 651. Under Michigan law as it already existed, one could sue a telecommunications carrier in a court of general jurisdiction if the cause of action sounded in tort or alleged that the carrier had violated a tariff or regulation. *Id.* If the claim arose solely out of the contractual relationship between the telephone company and the customer, however, the doctrine of primary jurisdiction would oblige the customer to proceed before the Michigan Public Service Commission. *Id.* The trial court and Court of

Appeals both reasoned that the phone company's "only duty to Rinaldo's arose 'as a result of a contractual agreement between defendant and a specific individual or entity.'" *Rinaldo's*, 559 N.W.2d at 651 (citation to slip op. omitted). Therefore, the lower courts concluded, Rinaldo's had no cognizable cause of action in tort and was required to assert its claim before the MPSC. *Id.*

The Supreme Court affirmed, agreeing that Rinaldo's could not state a tort claim. Rinaldo's had contended that Michigan Bell owed it "a duty to conduct its business in a reasonable manner; to provide the Plaintiff with adequate telephone service . . . ; to employ competent trained personnel; to maintain, inspect, and use equipment in an appropriate manner so as not to injure the Plaintiff in business; and to be honest and forthright in its dealings with Plaintiff." *Rinaldo's*, 559 N.W.2d at 656. The Supreme Court agreed that Michigan Bell owed Rinaldo's each of the aforementioned duties, but it found that those duties "arose solely out of the contractual obligation between the parties and not from any independent legal obligations supporting a cause of action in tort." *Id.* Writing for a unanimous 6-0 Court (with Justice Weaver not participating), Justice Boyle rejected the notion that a claim could sound in tort merely because the complaint alleged tortious conduct. *Rinaldo's*, 559 N.W.2d at 657. The Court approved the Court of Appeals's reasoning that

> [i]n a contractual setting, a tort action must rest on a breach of duty distinct from contract . . . . Mere failure to perform an obligation under a contract cannot give rise to a negligence cause of action in tort . . . .
>
> The [telephone company] does not owe a general duty to provide and maintain telephone service to the public at large. To the contrary, defendant's "duty" to do so only arises as a result of a contractual agreement between defendant and a specific individual or entity . . . .

*Rinaldo's*, 559 N.W.2d at 657. But the Supreme Court added its own gloss, which might make it more difficult, in some cases, to survive a dispositive motion which challenges the existence of a cognizable tort cause of action. The question whether a claim sounds in contract or in tort "is not

to be resolved by mere allegation, but rather by analysis of whether the facts pled give rise to a legal duty in tort independent of breach of contract." *Id.* at 657.

Otherwise, the Court again followed *Hart*, approving its statement that "'[a]s a general rule, there must be some negligence or malfeasance to support a tort. There must be some breach of duty distinct from breach of contract.'" *Rinaldo*, 559 N.W.2d at 657 (quoting *Hart*, 79 N.W.2d 895).

Because it can be so difficult to distinguish between misfeasance and nonfeasance, the *Rinaldo's* Court emphasized *Hart*'s explanation that the fundamental principle separating the causes of action is the concept of duty. The Court observed the common elements running through the cases where misfeasance on a contract was found to support a tort claim: a relationship between the parties or other circumstance that would give rise to a legal duty of care even if there were no contract, and a risk to life or tangible property from the defendant's conduct. The Court wrote:

> [I]n each a situation of peril [was] created, with respect to which a tort action would lie without having recourse to the contract itself. Machinery [was] set in motion and *life or property [was] endangered* . . . . In such cases . . . we have a "breach of duty distinct from . . . contract." Or, as Prosser puts it . . . "if a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise not."

*Rinaldo's*, 559 N.W.2d at 658 (quoting *Hart*, 79 N.W.2d at 895) (emphasis and bracketed alterations in original). ***"In other words, the threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation."*** *Rinaldo's*, 559 N.W.2d at 658. Comparing Rinaldo's dispute with Michigan Bell case to the situations it confronted in *Hart* and *Valentine*, the Supreme Court concluded,

> In this case, as in *Hart*, the defendant agreed to provide the plaintiff with services under a contract. Like the defendant in *Hart*, Michigan Bell allegedly failed to fully perform according to the terms of its promise. While plaintiff's allegations arguably make out a claim for "negligent performance" of the contract, there is no allegation that this conduct by the defendant constitutes tortious activity in that it caused

physical harm to persons or tangible property; and plaintiff does not allege violation of an independent legal duty distinct from the duties arising out of the contractual relationship.

Like the plaintiff in *Valentine*, "regardless of the variety of names [plaintiff gives the] claim, [plaintiff is] basically complaining of inadequate service and equipment . . . ." *Id.* at 22, 199 N.W.2d 182. Thus, under the principles outlined above, there is no cognizable cause of action in tort.

*Rinaldo's*, 559 N.W.2d at 658 (paragraph break added).

**The Michigan Supreme Court's most recent pronouncement on the tort/contract issue was *Fultz v. Union Commerce Assocs.*, 683 N.W.2d 587 (Mich. 2004) (Maura Corrigan, C.J., for a 5-member majority).** It is difficult to discern the precise import of *Fultz*, but it criticizes reliance on the misfeasance/nonfeasance distinction. At the least, *Fultz* purports to relegate analysis of the misfeasance/nonfeasance distinction to a lesser role when determining whether a tort cause of action is cognizable under the particular facts.[25]

---

[25]

Justice Marilyn Kelly wrote a concurrence, which Justice Michael Cavanagh joined. *See Fultz*, 683 N.W.2d at 593-96 (Kelly, J., concurring, joined by Cavanagh, J.).

The concurring justices begin by noting the majority's observation that the Court had "defined a tort action stemming from misfeasance in terms of whether the 'plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation.'" *Fultz*, 683 N.W.2d at 594 (quoting *Rinaldo's*, 559 N.W.2d 647). The concurrence contends that the majority 's interpretation of that definition was "more expansive than . . . previously." *Id.* at 594. Specifically, the concurrence opined that the "separate and distinct duty" should not be applied to certain cases where the plaintiff was not a party to the contract in question:

The use of a "separate and distinct" test to determine whether a duty in tort arises independently of the contract may have appeal. However, it fails where the contract itself outlines a specific duty to protect third persons.

\* \* \*

[P]laintiff assumes that every agreement to undertake a task for another equates to an agreement to undertake the duty owed by the other to a third person. This is not accurate.

\* \* \*

Here, there is no evidence that the contract between Creative Maintenance [the

Fultz, a pedestrian who was injured when she slipped and fell on ice in a parking lot, sued in negligence against the parking-lot owner, Comm-Co, and the contractor which the owner had contracted to provide snow-removal and salting services for that lot, CML. *Fultz*, 683 N.W.2d at 589. At the time of Fultz's fall, CML had not plowed the lot in about 14 hours and had not salted the lot. *Id.* The jury found no breach of the oral contract between the owner Comm-Co and contractor CML, but it awarded compensatory damages to Fultz after finding that CML had been negligent by failing to perform under the contract and that said negligence was the proximate cause of her injuries. *Id.* The Michigan Court of Appeals affirmed, holding that CML owed a common-law duty to provide the contracted snow-removal and salting services in a reasonable manner, a duty which it breached by failing to perform its contractual obligations. *Id.*

The Michigan Supreme Court reversed, holding that, as a matter of law, CML owed no contractual or common-law duty to plaintiff to plow or salt the parking lot. *Fultz*, 683 N.W.2d at 590. The *Fultz* majority reasoned as follows:

---

snow-plowing and ice-salting company] and the shopping center contemplated that Creative would assume the duties that the center owed to the center's business invitees. Thus, Fultz failed to establish that Creative owed her a duty under [Restatement of the Law of Torts 2d] § 324A(b).

Accordingly, I concur [only] with the result reached by the majority.

*Fultz*, 683 N.W.2d at 596 (Marilyn Kelly, J., joined by Michael Cavanagh, J.).

In the instant case, the Jodways were not parties to Capital's contract with the City. Therefore, the *Fultz* concurrence's objection to applying the "separate and distinct duty" test to putative tort claims against defendants who are not parties to the contract is apposite. Under the view of the Kelly-Cavanagh concurrence, *Fultz* would not foreclose any of the Jodways' claims against Capital. The concurrence, however, commanded only two votes compared to five votes for the majority, and neither the Michigan Supreme Court nor the Michigan Court of Appeals has treated the *Fultz* concurrence as governing law where it conflicts with the majority.

-58-

If one voluntarily undertakes to perform an act, having no prior obligation to do so, a duty may arise to perform the act in a non[-]negligent manner. [citations omitted]

We described this common-law duty in *Clark v. Dalman*, . . . 150 N.W.23d 755 ([Mich.] 1967):

> Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law . . . .

Such duty of care may be a specific duty owing to the plaintiff by the defendant, or it may be a general one owed by the defendant to the public, of which the plaintiff is a part. Moreover, while this duty of care, as an essential element of actionable negligence, arises by operation of law, it may and does arise out of a contractual relationship, the theory being that accompanying every contract is a common-law duty to perform with ordinary care the thing agreed to be done, and that a negligent performance constitutes a tort as well as a breach of contract. [*Clark*, 150 N.W.23d 755]

In defining the contours of this common-law duty, our courts have drawn a distinction between misfeasance (action) and nonfeasance (inaction) for tort claims based on a defendant's contractual obligations. We have held that a tort action will not lie when based solely on the nonperformance of a contractual duty. *See Hart v. Ludwig* . . . .

* * *

In *Hart* . . . 79 N.W.2d 895, this Court opined that the misfeasance/nonfeasance distinction is often largely semantic and somewhat artificial:

> The division thus made, between misfeasance, which may support an action either in tort or on the contact, and the nonfeasance of a contractual obligation, giving rise only to an action on the contract, is admittedly difficult to make in borderland [sic] cases. There are, it is recognized, cases in which an incident of nonfeasance occurs in the course of an undertaking assumed. Thus a surgeon fails to sterilize his instruments, an engineer fails to shut off steam, a builder fails to fill in a ditch in a public way. These are all, it is true, failures to act, each disastrous detail, in itself, a "mere" nonfeasance.

> But the significant similarity relates not to the slippery distinction between action and nonaction but to the fundamental concept of "duty"; in each a situation of peril has been created, with respect to which a tort action would lie without having recourse to the contract itself.

> We believe the "slippery distinction" between misfeasance and nonfeasance of a duty undertaken obscures the proper initial inquiry: Whether a particular defendant owes any duty at all to a particular plaintiff.
>
> [We] have defined a tort action stemming from misfeasance of a contractual obligation as the "violation of a legal duty separate and distinct from the contractual obligation." *Rinaldo's* . . . 559 N.W.2d 647 (1997); *see, also, e.g., Ferrett v. Gen. Motors Corp.* . . . 475 N.W.2d 243 (1991) . . . .
>
> **We believe that the "separate and distinct" definition of misfeasance offers better guidance in determining whether a negligence action based on a contract *and brought by a third party to that contract* may lie because it focuses on the threshold question of duty in a negligence claim.** As there can be no breach of a nonexistent duty, the former misfeasance/nonfeasance inquiry in a negligence case is defective because it improperly focuses on whether a duty was breached instead of whether a duty exists at all.

*Fultz*, 683 N.W.2d at 591-92 (emphasis added, internal citations omitted).

Thus, *Fultz* **dictates that this court's initial inquiry be whether the Capital defendants owed the allegedly-breached duties to the Jodways at all**, *not* focusing on whether each claim alleges misfeasance or nonfeasance as earlier precedents did. *See Fultz*, 683 N.W.2d at 592 ("We believe the "slippery distinction" between misfeasance and nonfeasance of a duty undertaken obscures the proper initial inquiry: [w]hether a particular defendant owes any duty at all to a particular plaintiff."); *see, e.g., Francisco v. Severance*, No. 279839, 2009 WL 2448184, *3 (Mich. App. Aug. 11, 2009) (after applying *Fultz*, panel remarked, "[B]ecause Severance owed no duty to plaintiff, the trial court erred by determining as a matter of law that Severance breached the purported duty. 'Only after finding that a duty exists may the factfinder.'") (quoting *Murdock v. Higgins*, 454 Mich. 46, 53, 559 N.W.2d 639, 642-43 (Mich. 1997)). This court determines that the Capital defendants did indeed owe the Jodways the duties which were allegedly violated by the conduct described in counts 7-9 (the duty to comply with environmental statutes for the protection of the Jodways and the rest of the public) and in counts 10, 11 and 14 (the duty to the Jodways not

to trespass on their land, the commit to the Jodways and the rest of the public not to commit a nuisance per se, and the duty to the Jodways not to act negligently so as to cause damage to their property rights).

**The next inquiry is whether these duties of the Capital defendants are sufficiently "separate and distinct" from those imposed by Capital's contract with the City.** Michigan's published precedents do not yet provide sufficient guidance to answer this question with ease. Nonetheless, the answer is "yes" as to the Capital defendants' duty to obey the environmental-protection statutes in counts 7-9, and its duty to the public not to violate the City's stormwater ordinance and thereby (arguably) commit a nuisance per se against the public (count 11): those duties are sufficiently "separate and distinct" from their contractual duties to be actionable

Conversely, the court determines that the Capital defendants' more-traditional duties not to commit trespass (count 10) and not to be negligent (count 14) are not sufficiently "separate and distinct", as the limited precedents applying that term have interpreted it, from their contractual duties. In determining that *Fultz* forecloses the negligence claim, the court is guided (though not bound) by *Lansing Pavilion, LLC v. Eastwood, LLC*, Nos. 281811, 282332, 283071, 2009 WL 2424677 (Mich. App. Aug. 6, 2009). Lansing Pavilion's predecessor-in-interest hired Eastwood to "mass balance the soils" of a construction site, "i.e., move soil to make the site flat for construction." *Lansing Pavilion*, 2009 WL 2424677 at *1 and n.2. The trial court dismissed Lansing Pavilion's negligence claim against Eastwood essentially on the ground that it was duplicative of its breach-of-contract claim, and the Court of Appeals affirmed. The panel wrote as follows:

> We also reject Lansing Pavilion's argument that the court erred in dismissing its negligence claim on the grounds [sic] that Eastwood owed no duty independent of contract. * * *
>                                  * * *

In opposing Lansing Pavilion's claim, Eastwood relies on *Fultz* for the proposition that Lansing Pavilion must allege a duty "separate and distinct" from any duty imposed under the contract to sustain its negligence claim. * * * [C]ontrolling here is the case on which *Fultz* relied – *Rinaldo's Constr. Corp. v. Michigan Bell Telephone Co.*, 454 Mich. 64, 84, 559 N.W.2d 647 (1997).

In *Rinaldo's Constr*, the plaintiff alleged that the defendant telephone company was negligent in failing to transfer the plaintiff's telephone service to its new address, thereby resulting in economic damages. *Id.* at 67-68 . . . . In determining whether the plaintiff could maintain an action in tort, the Court stated, "the threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation." *Id.* at 84 . . . .

Relying on *Hart v. Ludwig*, 347 Mich. 559, 565, 79 N.W.2d 895 (1956), which quoted Prosser, Handbook of Torts, 1st 3d., § 33, p 205, *the [Michigan Supreme] Court elaborated that ", otherwise not." Id.* [*Rinaldo's*, 454 Mich. At 84, 559 N.W.2d 647] * * *

Turning to the instant case, under the negligence count of the complaint, Lansing Pavilion alleged that Eastwood owed a duty to perform the grading and soil work "in a good and workmanlike manner in conformity with industry standards for contractors performing such work." At the outset, Lansing Pavilion correctly asserts that the mere existence of a contract did not permit Eastwood to commit misfeasance in performing the grading and soil work. *Rinaldo's Constr.*, [454 Mich.] at 84, 559 N.W.2d 647.

However, here, Lansing Pavilion's negligence claim goes directly to Eastwood's performance of the soil and grading work under the oral grading contract. Indeed, without enforcing the contract promise itself, Eastwood has no relationship with Lansing Pavilion giving rise to an independent legal duty. *Id.* . . . * * * In other words, *regardless of the names Lansing Pavilion gives its claim, the duty to perform site balancing "in a good and workmanlike manner in conformity with industry standards" is not "separate and distinct" from the duty created in contract.* [*Id.*] The trial court properly dismissed Lansing Pavilion's negligence claim.

*Lansing Pavilion*, 2009 WL 2424677 at *13 (some paragraph breaks added) (emphasis added).

This principle from *Hart* (Mich. 1956) and *Rinaldo's* (1997) – "if a relation[ship] exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie" – was clarified and re-articulated, but not disturbed, by *Fultz* (Mich. 2004). Applying the principle as it must, this court finds that the duties underlying all the claims except the negligence

claim would exist even if the Capital defendants never had a contract with the City. The mere duty not to perform contracted work negligently, however, is not sufficiently independent and distinct from the City-Capital contract to survive *Hart-Rinaldo-Fultz*.

Lastly, the court notes the consequences, in future cases, which would flow from adopting the extremely expansive reading of *Fultz* and its forebears urged by Capital. Under Capital's novel view, *Hart-Rinaldo-Fultz* would apply to bar all citizen claims against contractors for violating State laws and municipal ordinances which protect the public from destruction, pollution, or impairment of land, water, and air within the State. Capital would reason that every contract for regrading, excavation, construction, etc., contains within it an implied duty of good faith to obtain all legally required permits, obey all applicable statutes and regulations, and respect all common-law rights of those who own or are entitled to use surrounding properties. Therefore, Capital asserts, just about *any* claim by citizens harmed by a contractor's alleged failure to obtain those permits, obey those laws, and respect those rights, would be automatically dismissed without a court or a jury ever examining their merits.

Such a rule would work a particularly drastic change in the State's environmental-protection law. The Legislature contemplated that private citizens be empowered to sue for enforcement of the Clean Water, Soil and Sedimentation, and Inland Lakes and Streams Acts. Otherwise, the Legislature would not have merely limited *the type of relief* which citizens may seek in such private suits (leaving them free to seek declaratory and equitable relief even where the State itself has chosen not to act, or has not yet acted). Applying *Fultz* to bar these statutory environmental-protection claims would render nugatory the very right of citizen enforcement. Capital identified no case law to suggest that the Michigan Supreme Court intended to affect such a drastic change in

the legal landscape outside the negligence context, and the court finds none.[26]

_____

[26]

*See also Williams v. Aramark Mgmt. Servs. Ltd. P'ship*, No. 281741, 2009 WL 529632 (Mich. App. Mar. 3, 2009) (p.c.) (C.J. Saad, Davis, Servitto) (negligent mopping of floor);

*Engel Mmgt., Inc. v. Ford Motor Credit Co.*, No. 279868, 2009 WL 34882 (Mich. App. Feb. 12, 2009) (p.c.) (P.J. Zahra, Cavanagh, Meter) (financing company's breach of fiduciary duty by reducing available credit), *app. denied*, 769 N.W.2d 686 (Mich. Aug. 6, 2009);

*Mehta v. Limbright*, No. 282029, 2009 WL 279883 (Mich. App. Feb. 5, 2009) (p.c.) (C.J. Saad, Davis, Servitto) (negligent painting of house);

*Wayne State Univ. v. Shambaugh Fire & Safety, Inc.*, Nos. 278748 & 278816, 2008 WL 5077005 (Mich. App. Dec. 2, 2008) (p.c.) (P.J. Wilder, Jansen, Owens) (negligent installation of fire-sprinkler system);

*Van Elslander v. Thomas Seebold & Assocs., Inc.*, Nos. 272396 & 274966, 2008 WL 5077011 (Mich. App. Dec. 2, 2008) (p.c.) (P.J. Schuette, Borrello, Gleicher) (negligent construction and repair of a home which rendered it particular susceptible to water damage and mold from rainstorm), *app. denied*, 765 N.W.2d 334 (Mich. 2009);

*City of Romulus v. Lanzo Const., Inc.*, No. 274666, 2008 WL 1829686 (Mich. App. Apr. 24, 2008) (p.c.) (P.J. Beckering, Sawyer, Fort Hood) (negligence-based products-liability claim relating to allegedly defective construction of concrete section of a road);

*Churchill v. J.P. Auction Co., Inc.* No. 274461, 2008 WL 996441 (Mich. Apr. 10, 2008) (P.J. Murray, Sawyer, Cavanagh) (p.c.) (Real estate broker and auctioneer's negligent drafting of purchase agreements which did not contain adequate legal description of the property to be sold), *app. denied*, 769 N.W.2d 220 (Mich. 2008);

*Leffler v. HTNB Corp.*, No. 275962, 2008 WL 723992 (Mich. App. Mar. 18, 2008) (p.c.) (P.J. O'Connell, Borrello, Gleicher) (engineering consulting firm's alleged negligence with regard to scaffolding whose support brackets failed and caused him to fall 30 feet to the pavement);

*Dietrich v. Greco Title Co.*, No. 274970, 2008 WL 509845 (Mich. App. Feb. 26, 2008) (p.c.) (P.J. Fitzgerald, Murphy, Borrello) (closing agent's negligent failure to discover and pay back taxes due on property before closing);

*Seger v. Emcon Assocs.*, No. 274827, 2008 WL 441542 (Mich. App. Feb. 19, 2008) (p.c.) (P.J. Bandstra, Donofrio, Servitto) (negligent installation of an "animal habitat" at pet store);

*Hernandez v. Studio Plus Props., Inc.*, No. 272658, 2007 WL 1166052 (Mich. App. Apr. 19, 2007) (p.c.) (P.J. Donofrio, Fitzgerald, Markey) (failure to remove snow from hotel premises);

On the contrary, in the five years since the Michigan Supreme Court issued *Fultz*, the

Michigan courts have repeatedly applied it to foreclose negligence-type claims. This court has not

located any Michigan court decision, even unpublished or at the trial-court level, which invoked

*Fultz* to foreclose citizen-enforcement claims under environmental-protection statutes (or any other

statutes). *See, e.g., applying Fultz* to dismiss tort claims: *Mierzejewski v. Torre & Bruglio, Inc.*, 729

N.W.2d 225 (Mich. 2007) (without opinion, Supreme Court granted leave to appeal and cited *Fultz*

to order dismissal of claim that defendant was negligent in removing snow from parking lot of

plaintiff's workplace); *Banaszak v. N.W. Airlines, Inc.*, 722 N.W.2d 433 (Mich. 2006) (without

opinion, Supreme Court granted leave to appeal and cited *Fultz* to order dismissal of claim that

contractor was negligent in placing plywood to cover portion of airport that was under construction);

*Petfreedom.com, LLC v. Net Generation, Inc.*, No. 284285, 2009 WL 2382430 (Mich. App. Aug.

4, 2009) (p.c.) (P.J. Talbot, Fitzgerald, Hoekstra) (negligent misrepresentation); *Farmer v. Practical

Ltd. Dividend Hsg. Ass'n*, No. 280627, 2009 WL 2168912 (Mich. App. July 21, 2009) (p.c.) (P.J.

---

*Albert v. Mich. Waste Energy, Inc.*, Nos. 271645 & 271646, 2007 WL 949420 (Mich. App. Mar. 29, 2007) (p.c.) (P.J. Zahra, Bandstra, Owens) (negligent maintenance of steam-heat system, causing steam from manhole to obscure plaintiff as he walked across street and was hit by vehicle);

*Perry v. L & A Mobile Home Repair, Inc.*, No. 272970, 2007 WL 914310 (Mich. App. Mar. 27, 2007) (p.c.) (P.J. Zahra, Bandstra, Owens) (negligent construction and inspection of carport and gutter downspout, which caused accumulation of ice, which in turn caused plaintiff to slip and fall);

*Wallington v. City of Mason*, Nos. 267919 & 269884, 2006 WL 3826761 (Mich. App. Dec. 28, 2006) (p.c.) (P.J. Markey, Saad, Wilder) (negligent failure to provide appropriate "shoring" or "bracing" caused trench to cave in on plaintiff while he was working in it to install a water main), *app. denied*, 735 N.W.2d 252 (Mich. 2007);

*Forester v. ServPro of Bloomfield & Livonia*, No. 268545, 2006 WL 3299207 (Mich. App. Nov. 14, 2006) (p.c.) (C.J. Whitbeck, Hoekstra, Wilder) (negligent cleaning and restoration services in home later purchased by plaintiffs).

Fort Hood, Wilder, Borrello) (negligent clearing of snow and ice from apartment complex premises); *Glenn v. First Am. Title Ins. Co.*, No. 285669, 2009 WL 1830745 (Mich. App. June 25, 2009) (p.c.) (P.J. Owens, Servitto, Gleicher) (negligence predicated on failure to discover and/or disclose a notice of condemnation of property); *Lenz v. Michigan Multi-King, Inc.*, No. 283312, 2009 WL 1067556 (Mich. App. Apr. 21, 2009) (p.c.) (P.J. Beckering, Talbot, Donofrio) (restaurant customer's claim for negligent placement of linen bag in hallway leading to restroom which led to fall); *Gray v. Standard Fed. Bank*, No. 269668, 2008 WL 161923 (Mich. App. Jan. 17, 2008) (p.c.) (P.J. Saad, Borrello, Gleicher) (mortgagee's failure to properly calculate and pay property taxes); *Lipp v. Bruce*, No. 270264, 2007 WL 2935027 (Mich. App. Oct. 9, 2007) (p.c.) (P.J. Jansen, Fitzgerald, Markey) (negligent construction of plaintiffs' log home); *Granberry v. Harper Hosp.*, No. 266775, 2006 WL 2482875 (Mich. App. Aug. 29, 2006) (p.c.) (P.J. Neff, Bandstra, Zahra) (negligent arrangement of "metal sheets" around areas on hospital premises that were under construction), *app. denied*, 727 N.W.2d 623 (Mich. 2007); *Kisiel v. Holz*, 725 N.W.2d 67, 69-71 (Mich. App. 2006) (customer's claim for negligent performance under subcontract involving excavation and pouring of concrete); *Thacker v. Encompass Ins.*, No. 265405, 2006 WL 1451554 (Mich. App. May 25, 2006) (p.c.) (P.J. Cavanagh, Fort Hood, Servitto) (contractors' negligent remediation of mold in plaintiff's home).

Because this court's duty is to ascertain, or predict, how the Michigan Supreme Court would rule on these claims, it has no basis for dismissing any but the negligence claim against the Capital defendants under *Hart, Rinaldo* and *Fultz*.[27]

---

[27]

One recent published Michigan Court of Appeals decision is significant for what it does *not* say. In *Terlecki v. Stewart*, 754 N.W.2d 899 (Mich. App.) (P.J. Markey, Meter, Murray), *app. denied*, 758 N.W.2d 244 (Mich. 2008), the owners of a flooded lakeshore property sued a property association and a contractor for constructing (with DEQ permission) a replacement concrete spillway at a higher elevation than the original spillway and thereby causing the lake level to rise.

## DISCUSSION:
## Jodway's Request for Rule 11 Sanctions

The Jodways' reply in support of her summary-judgment motion states as follows with

regard to their belief that the Capital defendants should be subjected to Rule 11 sanctions:

It is interesting to note that in Defendants' Reply/Response to the Jodways' Counter-Motion for Summary Judgment [Doc. No. 73, filed April 7, 2009, at page 3] they continue to claim [that] no misrepresentations were made to the MI-DEQ:

> More importantly, all of the water supply lines involved in the subject project were within valid rights of way, so this permit was properly prepared and filed and did not involve any misrepresentations to the DEQ.

At the time Jodways filed their Amended Complaint they were only aware of Defendants' August 18, 2005 Permit Application for the Water Service Lines (Please see Exhibit J of Jodways' Counter-Motion). The Water Line Permit was the only permit produced by Defendants and Defendant-Boyne City in response to Jodways' three (3) Freedom of Information Act ("FOIA") requests dated July 14, 2006, September 7, 2007 (appealed in October 2007) and November 20, 2007.

However, the Jodways recently discovered that Defendants also filed a Permit Application for Wastewater Systems on August 18, 2005 (Cover Letter - Exhibit P and Application - Exhibit Q). On April 10, 2009, both of the Jodways spent seven (7) hours at the MI-DEQ Cadillac Office conducting a FOIA inspection of MI-DEQ records.

The Jodways also spoke with Brian Jankowski, the MI-DEQ Engineer who reviewed and e-mailed an inquiry to Defendant-Hirschenberger requesting clarification regarding the Bay Street Sanitary Sewer Main being located outside the public right of way (¶ 6 of Jankowski's Letter of 9/8/05 - Exhibit R). [footnote 1: Mr. Jankowski explained that his letter of 9/8/05 was labeled "DRAFT" because it was e-mailed to Defendant-Hirschenberger and that it was mandatory that only unionized clerical staff (who are often backlogged) could send out the hard copies of letters.]

---

The owners asserted claims for negligence, negligence *per se*, nuisance, trespass, and conspiracy. The Court of Appeals held that statutes barred the owners from recovering monetary damages on any of their claims, and that their claims for non-monetary relief were time-barred. *See Terlecki*, 754 N.W.2d at 903. The opinion made no mention of the notion that any of the claims might be foreclosed by *Fultz*.

In Defendant-Hirschenberger's e-mail response (Exhibit S) he claims there was an ". . . agreement between the City and the property owners [Jodways] . . . []." The fact of the matter is that there is no agreement between the Jodways and Defendant-Boyne City. For, if such an agreement actually existed, it begs the question: why haven't Defendants produced it in defense to Jodways' claims or FOIA requests? The answer is simple – it does not exist. The Defendants made material misrepresentations to the MI-DEQ that fell outside the scope of their contract with Defendant-Boyne City. Further, Defendants committed fraud that is punishable by fine and/or imprisonment as stated in the Permit conditions (¶ g of Exhibit Q) to which a contract is never a defense.

The fact remains that both the water service and sanitary sewer lines were located outside of the platted Bay Street right of way and encroach upon Jodways' property rights. It is also a fact that Defendants made material misrepresentations to the MI-DEQ, despite their duty otherwise. More troublesome is the fact that Defendants and their Attorneys are now making misrepresentations and omissions to this Court contrary to the requirements of FRCP 11. Accordingly, the Jodways request this Honorable Court order Defendants and their Attorneys to: (1) Produce the purported agreement and (2) Show cause that their Motion has not violated FRCP 11(b). * * *

P's Reply (Doc. No. 74) at 3-4 (paragraph breaks added). The Capital defendants filed a supplemental reply brief responding to the Rule 11 allegations as follows:

The Statement of Material Facts section of Plaintiff's [opening summary-judgment brief / opposition brief] asserts that Capital Consultants was guilty of "intentionally misrepresenting that the pipes would be laid in a public rights [sic] of way." To support this allegation Plaintiffs attached Exhibit J, which is a copy of the Permit Application for Water Supply Systems associated with the Bay Street Project, and Exhibits H and I, which Plaintiff has identified as "Pre and Post Construction Blueprint Excerpts" showing a domestic water pipe encroachment on Plaintiffs' property.

As noted in Capital Consultant's Reply, however, this permit application is totally unrelated to any of Plaintiffs' claims in this case, which are entirely limited to complaints about the impact of the Bay Street Project on a storm drain that had been located on Plaintiffs' property for many years prior to the renovation of the street in front of their house. Even if the Bay Street Project did result in the relocation of a domestic water line out of an existing easement and onto a section of Plaintiffs' property for which there was no easement, and even if the Permit Application indication that all lines would be located within existing easements was incorrect, this provides absolutely no evidentiary support whatsoever in support [sic] of Plaintiffs' claims in this matter.

Defs' Supp Reply (Doc. No. 75) at 1-2 (paragraph break added).

**The court declines to entertain the Jodways' intended Rule 11 motion at this time because they have not complied with the requirements for such a motion.** First, the Jodways did not make the sanction request in "separately from any other motion" as required by FED. R. CIV. P. 11(c)(2). *See Griffin v. Reznick*, 609 F. Supp.2d 695, 705 n.6 (W.D. Mich. 2008) (declining to consider request for Rule 11 sanctions because it was made only in a brief in opposition to a dispositive motion; "The drafters instruct that a 'separate' motion is one that is 'not simply included as an additional prayer for relief contained in another motion.'") (quoting *Ridder v. City of Springfield*, 109 F.3d 288, 294 n.7 (6th Cir. 1997)).

Second, the Jodways did not adhere to FED. R. CIV. P. 11(c)(2)'s "safe harbor" provision, which requires them to serve their intended Rule 11 motion on the Capital defendants at least 21 days before filing it with the court. "[T]he 21-day notice and opportunity to correct are crucial", *Two Men and a Truck Int'l, Inc. v. Two Men and a Truck-Kalamazoo, Inc.*, 1996 WL 740540, *1 (W.D. Mich. Oct. 16, 1996) (Quist, J.), and our Circuit requires strict compliance with the safe-harbor requirement, *Ridder*, 109 F.3d at 297. *See, e.g., El v. Mortgage, Ltd.*, 2009 WL 1953057, *4 (E.D. Mich. July 6, 2009) (Steven Murphy, J.) (denying Rule 11 motion for this reason); *Bradford v. Lanphere*, 2009 WL 1606559, *2 (W.D. Mich. June 8, 2009) (Robert Holmes Bell, J.) (declining to consider Rule 11 motion for this reason); *Aslani v. Sparrow Health Sys.*, 2009 WL 736654, *7 (W.D. Mich. Mar. 12, 2009) (Maloney, C.J.) (same); *accord US v. Marion L. Kincaid Trust*, 463 F. Supp.2d 680, 697 (E.D. Mich. 2006) (David Lawson, J.); *Standard Ins. Co. v. Cooper-Pipkins*, 2004 WL 5000044 (N.D. Tex. Nov. 24, 2008).

Compliance with the safe harbor provision would afford the Capital defendants an

opportunity to formally disavow and withdraw the allegedly offending statement, or to supply information clarifying and substantiating it, or to reach an out-of-court settlement with the Jodways regarding the issue. *See, e.g., Essroc Cement Corp. v. CPRIN, Inc.*, 2009 WL 2033052, *20 (W.D. Mich. July 9, 2009) (entertaining Rule 11 motion which contended that plaintiffs had willfully persisted in pursuing obviously-meritless claims, where defendants had served motion on plaintiffs 21 days before filing it, "affording [plaintiff] an opportunity to withdraw the amended complaint (or to seek leave to further amend it to supply additional factual allegations bearing on the elements of counts nine and ten).").

This court declines to act *sua sponte* pursuant to FED. R. CIV. P. 11(c)(3), but today's opinion shall not prevent Jodway from filing a fully-compliant Rule 11 motion against the Capital defendants. *See generally Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 395 (6th Cir. 2009) (discussing in detail the Rule's history, purpose, and requirements); *see, e.g, Garber v. Shiner Enters., Inc.*, 2007 WL 2320073, *3 (W.D. Mich. Aug. 10, 2007) (Quist, J.) ("The Court previously dismissed the motion without prejudice based upon Shiner's apparent failure to comply with the safe harbor provision of Rule 11. Shiner has since refiled its motion in which it presented proof that it provided Garber's counsel with a copy of the motion . . . more than 21 days before filing . . . .").

## ORDER

The summary-judgment motion of defendants Capital Consultants, Fox, and Hirschenberger [doc. #58] is **GRANTED in part, DENIED in part, and DENIED without prejudice in part.**

Plaintiffs' motion for summary judgment on the claims against Capital Consultants, Fox, and Hirschenberger [doc. # 62] is **DENIED in part and DENIED without prejudice in part.**

The following six claims **SURVIVE** against the three Capital defendants:

– Count 7 (Clean Water Act)
– Count 8 (Soil and Sedimentation Act)
– Count 9 (Inland Lakes and Streams)
– Count 10 (Michigan Statutory Nuisance)
– Count 11 (Michigan Statutory Trespass)
– Count 25 (Intentional Infliction of Emotional Distress)[28]


<u>One claim is **DISMISSED** as to the three Capital defendants under *Fultz*</u>:
– Count 14 (Michigan common-law negligence)


Capital defendants' request to dismiss Counts 7, 8 and 9 for lack of statutory authorization for private individuals to bring suit is **DENIED**.

Capital defendants' request to dismiss Counts 7, 8 and 9 for lack of standing is **DENIED**.


However, plaintiffs' requests for relief other than declaratory and equitable relief on counts 7, 8 and 9 – e.g., compensatory damages, punitive damages, fines and penalties, and attorney fees and costs – are **DISMISSED**. Accordingly, these parts of the amended complaint are **STRICKEN**:

– In Count 7's Prayer for Relief following Paragraph 183: subparagraphs J and K
– In Count 8's Prayer for Relief following Paragraph 192: subparagraphs H and I
– In Count 9's Prayer for Relief following Paragraph 207: subparagraphs J and K


**On the merits of plaintiffs' claims against Capital** defendants in Counts 7, 8 and 9 (Michigan environmental statutes), count 10 (Michigan statutory nuisance *per se*), and count 11 (Michigan statutory trespass), both summary judgment motions are **DENIED without prejudice a**s premature.

These parties **MAY FILE** renewed summary-judgment motions on the surviving claims

---

[28]Neither side has sought summary judgment on the IIED claim.

**AFTER** the completion of discovery.[29]  If the parties do so, the briefs **SHALL NOT** attempt to re-argue any issues decided herein, nor shall they address Rule 11 issues.

This is <u>not</u> a final and immediately-appealable order.

**IT IS SO ORDERED** on this <u>28th</u> day of September 2009.

/s/ Paul L. Maloney

Honorable Paul L. Maloney
Chief United States District Judge

---

[29]

"[B]ecause MCR 2.116(E)(3) permits a party to file more than one motion under MCR 2.116, a trial court's denial of one summary disposition motion does not bar a subsequent motion for summary disposition, even if filed on identical grounds." *Lansing Pavilion*, 2009 WL 2424677 at *6 (citing *Limbach v. Oakland Cty. Bd. of Rd. Comm'rs*, 226 Mich. App. 389, 395, 573 N.W.2d 336, 340 (Mich. App. 1997) (Saad, J.) and *Goodrich v. Moore*, 8 Mich. App. 725, 728, 155 N.W.2d 247, 249 (Mich. App. 1967)).